**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| **MICHAEL GUREVICH and ELENA GUREVICH, on behalf of themselves and all others similarly situated,** | ) ) ) ) | **Case No.**_____ |
| **Plaintiffs,** | ) ) | **Judge:**_____ |
| | ) ) | **Magistrate:**_____ |
| **v.** | ) ) | |
| **COMPAGNIA AEREAS ITALIANA, SPA d/b/a ALITALIA AIRLINES** | ) ) ) | **JURY TRIAL DEMANDED** |
| **Defendants.** | ) ) | |

**CLASS ACTION COMPLAINT**

Plaintiffs, Michael Gurevich and Elena Gurevich, individually and on behalf of all others

similarly situated ("the Class"), bring this action against Defendant Compagnia Aereas Italiana,

SPA ("Alitalia Airlines" or "Alitalia"). Plaintiffs seek certification of their claims against

Alitalia as a class action. Plaintiffs, by and through their attorneys, submit this Class Action

Complaint (the "Complaint") and allege as follows:

**I.      NATURE OF THE ACTION**

1.      This proposed class action concerns Alitalia's breach of contract and violation of

Regulation No. 261/2004 of the European Parliament and European Council ("EU Regulation

261"). Under Alitalia's General Conditions of Carriage and EU Regulation 261, passengers with

confirmed reservations on flights departing from or destined to an airport in a member state of

the European Union are entitled, with certain exceptions described below, to be paid a set

amount of compensation by Alitalia when their flights are canceled or delayed for three hours or

more. Alitalia has failed to honor this right under the General Conditions of Carriage and under

EU Regulation 261 as to the named Plaintiffs and the members of the Class. This action seeks damages for the named Plaintiffs and each member of the Class in the amount established by the General Conditions of Carriage and EU Regulation 261.

## II.   <u>JURISDICTION AND VENUE</u>

2.     This Court has jurisdiction over this matter pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), in that:

(a)   This is a class action involving 100 or more class members; and

(b)   Plaintiffs, residents of, and domiciled in, Illinois, are diverse in citizenship from Defendant Alitalia, which is incorporated and has its principal place of business in Italy.

3.     This case is properly maintainable as a class action pursuant to and in accordance with Rule 23(a) of the Federal Rules of Civil Procedure in that:

(a)   The Class is so numerous that joinder of all members is impractical;

(b)   There are substantial questions of law and fact common to the Class including those set forth in greater particularity below;

(c)   This case is properly maintainable as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

i.     Questions of law and fact enumerated below, which are all common to the Class, predominate over any questions of law or fact affecting only individual members of the Class;

ii.    A class action is superior to any other type of action for the fair and efficient adjudication of the controversy;

iii.   The relief sought in this class action will effectively and efficiently provide relief to all members of the class; and

iv.    There are no unusual difficulties foreseen in the management of this class action.

4.     The Court has personal jurisdiction over Alitalia, which has at least minimum contacts with the State of Illinois because Alitalia has conducted business there and has availed itself of Illinois' markets through its operations, offices, sales, and marketing efforts.

## III.  PARTIES

5.      Plaintiffs Michael Gurevich and Elena Gurevich are permanent residents of, and domiciled in, Illinois.

6.      Defendant Alitalia is an Italian corporation organized under the laws of the Italy and maintains is principal place of business in Italy.

## IV.  FACTUAL ALLEGATIONS

### A.      EU REGULATION 261.

7.      EU Regulation 261 was adopted by the European Parliament and the Council of the European Union on February 11, 2004.  A copy is attached hereto as Exhibit 1.  The purpose of EU Regulation 261 is, in part, to provide standardized compensation - separate from individualized compensation which may be provided by other laws upon individualized proof - for the "serious trouble and inconvenience" inevitably suffered by all passengers who experience flight cancellations or lengthy delays, particularly on international carrier routes.

8.      Pursuant to Article 3, EU Regulation 261 applies to passengers with confirmed reservations on (a) flights departing from an airport located in the territory of a member state of the European Union, and (b) flights departing from a country outside the European Union to an airport in the territory of a member state of the European Union, if the operating carrier of the flight concerned is an air carrier with an operating license granted by a member state of the European Union.

9.      Pursuant to Article 5, confirmed passengers on flights covered by Article 3, in case of cancellation of the flight "have the right to compensation by the operating air carrier in accordance with Article 7 of the Regulation unless:  (a) they are informed of the cancellation at least two weeks before the scheduled time of departure; or (b) they are informed of the

3

cancellation between two weeks and seven days before the scheduled time of departure and are offered re-routing, allowing them to depart no more than two hours before the scheduled time of departure and to reach their final destination less than four hours after the scheduled time of arrival; or (c) they are informed of the cancellation less than seven days before the scheduled time of departure and are offered re-routing, allowing them to depart no more than one hour before the scheduled time of departure and to reach their final destination less than two hours after the scheduled time of arrival." Also under Article 3, an "operating air carrier shall not be obliged to pay compensation in accordance with Article 7, if it can prove that the cancellation is caused by extraordinary circumstances which could not have been avoided even if all reasonable measures had been taken."

10.     Pursuant to Article 7, passengers eligible under Articles 3 and 5 on flights that were cancelled, "shall receive compensation amounting to:  (a) EUR 250 for all flights of 1500 kilometres or less; (b) EUR 400 for all intra-Community flights of more than 1500 kilometres, and for all other flights between 1500 and 3500 kilometres; (c) EUR 600 for all flights not falling under (a) or (b)."

11.     Article 7 also provides that the operating carrier may reduce the compensation amounts by 50% when "passengers are offered re-routing to their final destination on an alternative flight, the arrival time of which does not exceed the scheduled arrival time of the flight originally booked (a) by two hours, in respect of all flights of 1500 kilometres or less; or (b) by three hours, in respect of all intra-Community flights of more than 1500 kilometres and for all other flights between 1500 and 3500 kilometres; or (c) by four hours, in respect of all flights not falling under (a) or (b)."

12.     On November 19, 2009, in *Sturgeon v. Condor Flugdienst GmbH,* the European

Court of Justice ruled that "Article 5, 6 and 7 of Regulation No 261/2004 must be interpreted as

meaning that passengers whose flights are delayed may be treated, for the purposes of the

application of the right to compensation, as passengers whose flights are cancelled and may thus

rely on the right to compensation laid down in Article 7 of the regulation where they suffer, on

account of a flight delay, a loss of time equal to or in excess of three hours."  In addition, the

European Court of Justice ruled that "Article 5(3) of Regulation No 261/2004 must be

interpreted as meaning that a technical problem in an aircraft which leads to the cancellation or

delay of a flight is not covered by the concept of "extraordinary circumstances" within the

meaning of that provision, unless that problem stems from events which, by their nature or

origin, are not inherent in the normal exercise of the activity of the air carrier concerned and are

beyond its actual control."

13.     The right to compensation under Articles 5, 6 and 7 of EU Regulation 261 is

separate from any right to compensation or damages, based upon individualized proof, any

passenger may have premised on a separate cause of action under separate law.

**B.      ALITALIA'S CONTRACTUAL OBLIGATION TO THE CLASS
          MEMBERS.**

14.     Alitalia has an operating license granted by Italy, a member of the European

Union.

15.     Each passenger carried on a flight operated by Alitalia is issued a ticket which

includes Conditions of Contract, which incorporate by reference Alitalia's General Conditions of

Carriage.  A copy of the Alitalia's General Conditions of Carriage is attached hereto as Exhibit 2.

16. Article X, entitled "SCHEDULES, DELAYS, CANCELLATIONS, DENIED BOARDI NG" of Alitalia's General Conditions of Carriage, Section 10.4 defines its application as follows:

> "10.4  In this regard, in line with the provisions of EC Regulation no. 261/2004 with respect to passengers:
>
> a) departing from an airport located in the territory of a Member State of the European Union subject to the provisions of the European Community Treaty;
>
> b) departing from an airport located in a non-EU State with destination to an airport located in the territory of a Member State of the European Union to which said Treaty applies (except when the passengers receive benefits or compensations in goods and/or services or a financial indemnity and they have been provided service in such non-EU State);
>
> c) who have confirmed reservation on the flight concerned;
>
> d) and who, except in cases of cancellation, arrive for boarding in conformity to prescribed rules and at the time previously indicated in writing (including electronically) by the Carrier, tour operator or authorised travel agent or, if no time is indicated, at least forty-five minutes before the published departure time;
>
> e) who may have been transferred by the Carrier or by a tour operator from the flight for which they hold a reservation to another flight, regardless of reason;
>
> f) who do not travel free of charge or at a reduced fare that is not available, directly or indirectly, to the public, except if they hold tickets issued under a frequent flyer programme or other commercial programme by the Carrier or tour operators;

17. Further, Article X section 10.4(B) provides as follows:

> "**B) In case of cancellation,** in addition to **informing** passengers of available alternative means of transport, **offer** the following service:

*       *       *

"**(III) in addition, unless:**

(e) the passenger had been informed of the cancellation at least two weeks before the scheduled departure time; or

(f) the passenger had been informed of the cancellation between two weeks and seven days before the scheduled departure time and was offered re-routing on an alternative flight not more than two hours before the scheduled departure time, with arrival at the final destination less than four hours after the scheduled arrival time; or

(g) the passenger had been informed of the cancellation less than seven days before the scheduled departure time and was offered re-routing, departing on an alternative flight not more than one hours before the scheduled departure time, with arrival at the final destination less than two hours after the scheduled arrival time; or

(h) the Carrier can prove that cancellation was due to extraordinary circumstances that could not have been avoided even if all reasonable measure had been taken;

**pay the following compensation:**

(a) EUR 250 for all flights covering distances less than or equal to 1,500 kilometres;

(b) EUR 400 for all intra-community flights covering distances greater than 1,500 kilometres, and for all other flights covering distances from 1,500 to 3,500 kilometres;

(c) EUR 600 for all flights not falling under letters (a) or (b) above.

## C.    ALITALIA'S OPERATIONS.

18.     Alitalia is the flag carrier airline of Italy with over 22 million passengers per year. A significant percentage of Alitalia's flights are to and/or from an airport located in a member state of the European Union.  A significant percentage of those flights to and/or from an airport located in a member state of the European Union are cancelled, or delayed for three hours or

more, for reasons other than extraordinary circumstances. A significant percentage of the passengers on such delayed or cancelled flights are residents of the United States.

19.     Alitalia has repeatedly failed to pay compensation in the amounts set forth in the General Conditions of Carriage and EU Regulation 261 to passengers entitled to such compensation and who are residents of the United States.

**D.      FACTUAL ALLEGATIONS AS TO PLAINTIFFS RELEVANT TO CLASS ACTION CLAIMS.**

20.     Plaintiffs Michael Gurevich and Elena Gurevich are residents of, and domiciled, in Illinois.

21.     Plaintiffs were confirmed passengers on Alitalia Flight AZ629 scheduled to depart on April 16, 2009 from O'Hare International Airport in Chicago, Illinois to Leonardo da Vinci-Fiumicino International Airport in Rome, Italy, an airport located in a member state of the European Union. From Rome, Plaintiffs had a return flight scheduled, Alitalia Flight AZ628 scheduled to arrive in Chicago on April 26, 2009. The same as with any United States passenger traveling to Europe, a contract, incorporating and providing the remedies available under EU Regulation 261, existed between Alitalia and Plaintiffs Michael Gurevich and Elena Gurevich for Flights AZ629 and AZ628.

22.     Flight AZ629 was cancelled. Flight AZ629 was not cancelled due to extraordinary circumstances. Plaintiffs Michael Gurevich and Elena Gurevich were notified of the cancellation one day prior to the scheduled departure and were offered and re-routed on another Alitalia flight that was scheduled to depart on April 17, 2009, one day after the original scheduled departure of Flight AZ629.

23.     For their return flight, Flight AZ628 was also cancelled. Flight AZ628 was not cancelled due to extraordinary circumstances. Plaintiffs Michael Gurevich and Elena Gurevich

were notified the day of the scheduled departure and were offered and re-routed on another

Alitalia flight that was scheduled to depart on April 27, 2009, one day after the original

scheduled departure of Flight AZ 628.

24.     Plaintiffs were not offered re-routing that would have allowed them to depart no

more than one hour before the scheduled time of departure and to reach their final destination

less than two hours after the scheduled time of arrival.

25.     Plaintiffs Michael Gurevich and Elena Gurevich did not receive any

compensation for the canceled flights.

**E.      CLASS ACTION ALLEGATIONS.**

26.     Plaintiffs bring this action on their own behalf and on behalf of a class of all other

persons similarly situated (the "Class"), pursuant to Rule 23 of the Federal Rules of Civil

Procedure.

27.     Plaintiffs bring this action as class representatives to recover compensation

required to be paid under Alitalia's General Conditions of Carriage and EU Regulation 261.

28.     This action satisfies the numerosity, commonality, typicality, adequacy,

predominance, and superiority requirements of the Federal Rules of Civil Procedure Rule 23(a)

and (b).

29.     Plaintiffs seek certification of the following class:

All persons residing in the United States who meet the following requirements:

> (a)  Such person had a confirmed reservation on a flight operated by
>      Alitalia by motorized fixed wing aircraft schedule to arrive at its
>      destination on or after March 18, 2009;
>
> (b)  Such flight was scheduled either to depart from an airport located in
>      the territory of a member state to which the Treaty Establishing the
>      European Community ("Treaty") applies or to arrive at an airport
>      situated in the territory of a member state to which the Treaty applies;

(c) Such flight was delayed or cancelled for a reason other than extraordinary circumstances;

(d) Such person was informed of the delay or cancellation less than seven days before the scheduled time of departure and was not offered re-routing, allowing them to depart no more than one hour before the scheduled time of departure and to reach their final destination less than two hours after the scheduled time of arrival;

(e) Such person affected by delay was delayed for at least three hours; and

(f) Such person has not received compensation in the amount set forth in Article 7 of EU Regulation 261/2004.

30.     Excluded from the Class are:

(a) Defendants and any entities in which Defendants have a controlling interest;

(b) Any entities in which Defendants' officers, directors, or employees are employed and any of the legal representatives, heirs, successors or assigns of Defendants;

(c) The Judge to whom this case is assigned and any member of the Judge's immediate family and any other judicial officer assigned to this case;

(d) All persons or entities that properly execute and timely file a request for exclusion from the Class;

(e) Any attorneys representing the Plaintiff or the Class; and

(f) All governmental entities.

31.     Plaintiffs reserve the right to modify or amend the definition of the Class before the Court determines whether certification is appropriate.

32.     The Class is numerously comprised of over 100 people and most likely thousands of people who were passengers on flights operated by Alitalia, the joinder of which in one action would be impracticable.  The exact number or identification of the Class members is presently unknown.  The identity of the Class members is ascertainable.  In addition to manifests,

databases and rolls maintained by Alitalia and its agents, the Class members may be located and informed of the pendency of this action by a combination of electronic bulletins, e-mail, direct mail and public notice, or other means. The disposition of the claims of the proposed class members through this class action will benefit both the parties and the Court.

33.     Common questions of law and fact predominate over individual issues. There is a well-defined community of interest in the questions of law and fact involved affecting members of the Class. The questions of law and fact common to the Class predominate over questions affecting only individual Class members, and include, but are not limited to, the following:

a)      Whether Alitalia's General Conditions of Carriage requires Alitalia to pay compensation to the Class members;

b)      Whether EU Regulation 261 requires Alitalia to pay compensation to the Class members;

c)      Whether Alitalia failed to compensate the Class members in the amounts specified in the General Conditions of Carriage;

d)      Whether Alitalia failed to compensate the Class members in the amounts specified in EU Regulation 261;

e)      Whether Alitalia breached its contract with the Class members by failing to pay the compensation required under the General Conditions of Carriage and EU Regulation 261.

34.     Plaintiffs assert claims that are typical of the entire Class, having all been entitled to receive financial compensation pursuant to the General Conditions of Carriage and EU Regulation 261 and having not received such compensation. Plaintiffs and the Class members have similarly suffered harm arising from Alitalia's failure to pay compensation as alleged in this Complaint.

35.     Plaintiffs are adequate representatives of the Class because they fit within the class definition and their interests do not conflict with the interests of the members of the Class

they seek to represent. Plaintiffs will prosecute this action vigorously for the benefit of the entire

Class. Plaintiffs are represented by experienced and able attorneys from law firms that will

collectively and jointly serve as class counsel. Class counsel have litigated numerous class

actions, and Plaintiffs' counsel intend to prosecute this action vigorously for the benefit of the

entire Class. Plaintiffs and class counsel can and will fairly and adequately protect the interests

of all of the members of the Class.

36.     A class action is the best available method for the efficient adjudication of this

litigation because individual litigation of Class members' claims would be impracticable and

individual litigation would be unduly burdensome to the courts. Because of the size of each

individual Class member's claims, it would not be practicable for Class members to individually

seek legal redress for the wrongs identified in this Complaint. Without the class action vehicle,

the Class would have no reasonable remedy and would continue to suffer losses, as Alitalia

continues to fail to compensate passengers as required under its General Conditions of Carriage

and EU Regulation 261. Further, individual litigation has the potential to result in inconsistent or

contradictory judgments. A class action in this case presents fewer management problems and

provides the benefits of single adjudication, economies of scale, and comprehensive supervision

by a single court.

**V.      CLASS CLAIMS**

**COUNT ONE - BREACH OF CONTRACT**

37.     Plaintiffs restate and re-allege the preceding paragraphs of the Complaint as

though set forth at length herein.

38.     Alitalia's General Conditions of Carriage and EU Regulation 261 incorporated therein, require Alitalia to provide specified compensation to the Class for cancelled flights and flights delayed for three or more hours, as set forth above.

39.     Alitalia has violated the General Conditions of Carriage by failing to pay such compensation to the Class.

## VII.    PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray:

A.     That the Court determines that this action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure; that the Plaintiffs are proper class representatives; and that the best practicable notice of this action be given to members of the Class represented by the Plaintiffs;

B.     That judgment be entered against Alitalia and in favor of Plaintiffs and the Class on the Cause of Action in this Complaint, for actual, compensatory damages in an amount to be determined at trial;

C.     That judgment be entered imposing interest on damages, litigation costs, and attorneys' fees against Alitalia; and

D.     For all other and further relief as this Court may deem necessary and appropriate.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues so triable.

March 18, 2011                                     Respectfully submitted,

Jennifer W. Sprengel
**CAFFERTY FAUCHER LLP**
30 N. LaSalle Street, Suite 3200
Chicago, IL 60602
Tel:  (312) 782-4880
Fax:  (312) 782-4485

Hank Bates
**CARNEY WILLIAMS BATES
BOZEMAN & PULLIAM, PLLC**
11311 Arcade Drive, Suite 200
Little Rock, AR 72212
Tel: (501) 312-8500
Fax: (501) 312- 8505


Vladimir M. Gorokhovsky
**GOROKHOVSKY LAW OFFICE, LLC**
6045 North Green Bay Avenue, Suite 2A
Glendale, WI  53209
Tel:  (414) 218-1870

BY:  /s/ Hank Bates

*Counsel for Plaintiffs and Proposed Class*

# EXHIBIT 1

17.2.2004          EN          Official Journal of the European Union          L 46/1

I

*(Acts whose publication is obligatory)*

## REGULATION (EC) No 261/2004 OF THE EUROPEAN PARLIAMENT AND OF THE COUNCIL
### of 11 February 2004

**establishing common rules on compensation and assistance to passengers in the event of denied boarding and of cancellation or long delay of flights, and repealing Regulation (EEC) No 295/91**

**(Text with EEA relevance)**

THE EUROPEAN PARLIAMENT AND THE COUNCIL OF THE EUROPEAN UNION,

Having regard to the Treaty establishing the European Community, and in particular Article 80(2) thereof,

Having regard to the proposal from the Commission [1],

Having regard to the opinion of the European Economic and Social Committee [2],

After consulting the Committee of the Regions,

Acting in accordance with the procedure laid down in Article 251 of the Treaty [3], in the light of the joint text approved by the Conciliation Committee on 1 December 2003,

Whereas:

(1) Action by the Community in the field of air transport should aim, among other things, at ensuring a high level of protection for passengers. Moreover, full account should be taken of the requirements of consumer protection in general.

(2) Denied boarding and cancellation or long delay of flights cause serious trouble and inconvenience to passengers.

(3) While Council Regulation (EEC) No 295/91 of 4 February 1991 establishing common rules for a denied boarding compensation system in scheduled air transport [4] created basic protection for passengers, the number of passengers denied boarding against their will remains too high, as does that affected by cancellations without prior warning and that affected by long delays.

(4) The Community should therefore raise the standards of protection set by that Regulation both to strengthen the rights of passengers and to ensure that air carriers operate under harmonised conditions in a liberalised market.

(5) Since the distinction between scheduled and non-scheduled air services is weakening, such protection should apply to passengers not only on scheduled but also on non-scheduled flights, including those forming part of package tours.

(6) The protection accorded to passengers departing from an airport located in a Member State should be extended to those leaving an airport located in a third country for one situated in a Member State, when a Community carrier operates the flight.

(7) In order to ensure the effective application of this Regulation, the obligations that it creates should rest with the operating air carrier who performs or intends to perform a flight, whether with owned aircraft, under dry or wet lease, or on any other basis.

(8) This Regulation should not restrict the rights of the operating air carrier to seek compensation from any person, including third parties, in accordance with the law applicable.

(9) The number of passengers denied boarding against their will should be reduced by requiring air carriers to call for volunteers to surrender their reservations, in exchange for benefits, instead of denying passengers boarding, and by fully compensating those finally denied boarding.

[1] OJ C 103 E, 30.4.2002, p. 225 and OJ C 71 E, 25.3.2003, p. 188.
[2] OJ C 241, 7.10.2002, p. 29.
[3] Opinion of the European Parliament of 24 October 2002 (OJ C 300 E, 11.12.2003, p. 443), Council Common Position of 18 March 2003 (OJ C 125 E, 27.5.2003, p. 63) and Position of the European Parliament of 3 July 2003. Legislative Resolution of the European Parliament of 18 December 2003 and Council Decision of 26 January 2004.
[4] OJ L 36, 8.2.1991, p. 5.

(10) Passengers denied boarding against their will should be able either to cancel their flights, with reimbursement of their tickets, or to continue them under satisfactory conditions, and should be adequately cared for while awaiting a later flight.

(11) Volunteers should also be able to cancel their flights, with reimbursement of their tickets, or continue them under satisfactory conditions, since they face difficulties of travel similar to those experienced by passengers denied boarding against their will.

(12) The trouble and inconvenience to passengers caused by cancellation of flights should also be reduced. This should be achieved by inducing carriers to inform passengers of cancellations before the scheduled time of departure and in addition to offer them reasonable re-routing, so that the passengers can make other arrangements. Air carriers should compensate passengers if they fail to do this, except when the cancellation occurs in extraordinary circumstances which could not have been avoided even if all reasonable measures had been taken.

(13) Passengers whose flights are cancelled should be able either to obtain reimbursement of their tickets or to obtain re-routing under satisfactory conditions, and should be adequately cared for while awaiting a later flight.

(14) As under the Montreal Convention, obligations on operating air carriers should be limited or excluded in cases where an event has been caused by extraordinary circumstances which could not have been avoided even if all reasonable measures had been taken. Such circumstances may, in particular, occur in cases of political instability, meteorological conditions incompatible with the operation of the flight concerned, security risks, unexpected flight safety shortcomings and strikes that affect the operation of an operating air carrier.

(15) Extraordinary circumstances should be deemed to exist where the impact of an air traffic management decision in relation to a particular aircraft on a particular day gives rise to a long delay, an overnight delay, or the cancellation of one or more flights by that aircraft, even though all reasonable measures had been taken by the air carrier concerned to avoid the delays or cancellations.

(16) In cases where a package tour is cancelled for reasons other than the flight being cancelled, this Regulation should not apply.

(17) Passengers whose flights are delayed for a specified time should be adequately cared for and should be able to cancel their flights with reimbursement of their tickets or to continue them under satisfactory conditions.

(18) Care for passengers awaiting an alternative or a delayed flight may be limited or declined if the provision of the care would itself cause further delay.

(19) Operating air carriers should meet the special needs of persons with reduced mobility and any persons accompanying them.

(20) Passengers should be fully informed of their rights in the event of denied boarding and of cancellation or long delay of flights, so that they can effectively exercise their rights.

(21) Member States should lay down rules on sanctions applicable to infringements of the provisions of this Regulation and ensure that these sanctions are applied. The sanctions should be effective, proportionate and dissuasive.

(22) Member States should ensure and supervise general compliance by their air carriers with this Regulation and designate an appropriate body to carry out such enforcement tasks. The supervision should not affect the rights of passengers and air carriers to seek legal redress from courts under procedures of national law.

(23) The Commission should analyse the application of this Regulation and should assess in particular the opportunity of extending its scope to all passengers having a contract with a tour operator or with a Community carrier, when departing from a third country airport to an airport in a Member State.

(24) Arrangements for greater cooperation over the use of Gibraltar airport were agreed in London on 2 December 1987 by the Kingdom of Spain and the United Kingdom in a joint declaration by the Ministers of Foreign Affairs of the two countries. Such arrangements have yet to enter into operation.

(25) Regulation (EEC) No 295/91 should accordingly be repealed,

HAVE ADOPTED THIS REGULATION:

*Article 1*

**Subject**

1. This Regulation establishes, under the conditions specified herein, minimum rights for passengers when:

(a) they are denied boarding against their will;

(b) their flight is cancelled;

(c) their flight is delayed.

17.2.2004     EN     Official Journal of the European Union     L 46/3

2. Application of this Regulation to Gibraltar airport is understood to be without prejudice to the respective legal positions of the Kingdom of Spain and the United Kingdom with regard to the dispute over sovereignty over the territory in which the airport is situated.

3. Application of this Regulation to Gibraltar airport shall be suspended until the arrangements in the Joint Declaration made by the Foreign Ministers of the Kingdom of Spain and the United Kingdom on 2 December 1987 enter into operation. The Governments of Spain and the United Kingdom will inform the Council of such date of entry into operation.

*Article 2*

**Definitions**

For the purposes of this Regulation:

(a) 'air carrier' means an air transport undertaking with a valid operating licence;

(b) 'operating air carrier' means an air carrier that performs or intends to perform a flight under a contract with a passenger or on behalf of another person, legal or natural, having a contract with that passenger;

(c) 'Community carrier' means an air carrier with a valid operating licence granted by a Member State in accordance with the provisions of Council Regulation (EEC) No 2407/92 of 23 July 1992 on licensing of air carriers (¹);

(d) 'tour operator' means, with the exception of an air carrier, an organiser within the meaning of Article 2, point 2, of Council Directive 90/314/EEC of 13 June 1990 on package travel, package holidays and package tours (²);

(e) 'package' means those services defined in Article 2, point 1, of Directive 90/314/EEC;

(f) 'ticket' means a valid document giving entitlement to transport, or something equivalent in paperless form, including electronic form, issued or authorised by the air carrier or its authorised agent;

(g) 'reservation' means the fact that the passenger has a ticket, or other proof, which indicates that the reservation has been accepted and registered by the air carrier or tour operator;

(h) 'final destination' means the destination on the ticket presented at the check-in counter or, in the case of directly connecting flights, the destination of the last flight; alternative connecting flights available shall not be taken into account if the original planned arrival time is respected;

(i) 'person with reduced mobility' means any person whose mobility is reduced when using transport because of any physical disability (sensory or locomotory, permanent or temporary), intellectual impairment, age or any other cause of disability, and whose situation needs special attention and adaptation to the person's needs of the services made available to all passengers;

(j) 'denied boarding' means a refusal to carry passengers on a flight, although they have presented themselves for boarding under the conditions laid down in Article 3(2), except where there are reasonable grounds to deny them boarding, such as reasons of health, safety or security, or inadequate travel documentation;

(k) 'volunteer' means a person who has presented himself for boarding under the conditions laid down in Article 3(2) and responds positively to the air carrier's call for passengers prepared to surrender their reservation in exchange for benefits.

(l) 'cancellation' means the non-operation of a flight which was previously planned and on which at least one place was reserved.

*Article 3*

**Scope**

1. This Regulation shall apply:

(a) to passengers departing from an airport located in the territory of a Member State to which the Treaty applies;

(b) to passengers departing from an airport located in a third country to an airport situated in the territory of a Member State to which the Treaty applies, unless they received benefits or compensation and were given assistance in that third country, if the operating air carrier of the flight concerned is a Community carrier.

2. Paragraph 1 shall apply on the condition that passengers:

(a) have a confirmed reservation on the flight concerned and, except in the case of cancellation referred to in Article 5, present themselves for check-in,

— as stipulated and at the time indicated in advance and in writing (including by electronic means) by the air carrier, the tour operator or an authorised travel agent,

or, if no time is indicated,

— not later than 45 minutes before the published departure time; or

(b) have been transferred by an air carrier or tour operator from the flight for which they held a reservation to another flight, irrespective of the reason.

3. This Regulation shall not apply to passengers travelling free of charge or at a reduced fare not available directly or indirectly to the public. However, it shall apply to passengers having tickets issued under a frequent flyer programme or other commercial programme by an air carrier or tour operator.

---

(¹) OJ L 240, 24.8.1992, p. 1.
(²) OJ L 158, 23.6.1990, p. 59.

L 46/4    EN    Official Journal of the European Union    17.2.2004

4.    This Regulation shall only apply to passengers transported by motorised fixed wing aircraft.

5.    This Regulation shall apply to any operating air carrier providing transport to passengers covered by paragraphs 1 and 2. Where an operating air carrier which has no contract with the passenger performs obligations under this Regulation, it shall be regarded as doing so on behalf of the person having a contract with that passenger.

6.    This Regulation shall not affect the rights of passengers under Directive 90/314/EEC. This Regulation shall not apply in cases where a package tour is cancelled for reasons other than cancellation of the flight.

*Article 4*

**Denied boarding**

1.    When an operating air carrier reasonably expects to deny boarding on a flight, it shall first call for volunteers to surrender their reservations in exchange for benefits under conditions to be agreed between the passenger concerned and the operating air carrier. Volunteers shall be assisted in accordance with Article 8, such assistance being additional to the benefits mentioned in this paragraph.

2.    If an insufficient number of volunteers comes forward to allow the remaining passengers with reservations to board the flight, the operating air carrier may then deny boarding to passengers against their will.

3.    If boarding is denied to passengers against their will, the operating air carrier shall immediately compensate them in accordance with Article 7 and assist them in accordance with Articles 8 and 9.

*Article 5*

**Cancellation**

1.    In case of cancellation of a flight, the passengers concerned shall:

(a) be offered assistance by the operating air carrier in accordance with Article 8; and

(b) be offered assistance by the operating air carrier in accordance with Article 9(1)(a) and 9(2), as well as, in event of re-routing when the reasonably expected time of departure of the new flight is at least the day after the departure as it was planned for the cancelled flight, the assistance specified in Article 9(1)(b) and 9(1)(c); and

(c) have the right to compensation by the operating air carrier in accordance with Article 7, unless:

(i) they are informed of the cancellation at least two weeks before the scheduled time of departure; or

(ii) they are informed of the cancellation between two weeks and seven days before the scheduled time of departure and are offered re-routing, allowing them to depart no more than two hours before the scheduled time of departure and to reach their final destination less than four hours after the scheduled time of arrival; or

(iii) they are informed of the cancellation less than seven days before the scheduled time of departure and are offered re-routing, allowing them to depart no more than one hour before the scheduled time of departure and to reach their final destination less than two hours after the scheduled time of arrival.

2.    When passengers are informed of the cancellation, an explanation shall be given concerning possible alternative transport.

3.    An operating air carrier shall not be obliged to pay compensation in accordance with Article 7, if it can prove that the cancellation is caused by extraordinary circumstances which could not have been avoided even if all reasonable measures had been taken.

4.    The burden of proof concerning the questions as to whether and when the passenger has been informed of the cancellation of the flight shall rest with the operating air carrier.

*Article 6*

**Delay**

1.    When an operating air carrier reasonably expects a flight to be delayed beyond its scheduled time of departure:

(a) for two hours or more in the case of flights of 1 500 kilometres or less; or

(b) for three hours or more in the case of all intra-Community flights of more than 1 500 kilometres and of all other flights between 1 500 and 3 500 kilometres; or

(c) for four hours or more in the case of all flights not falling under (a) or (b),

passengers shall be offered by the operating air carrier:

(i) the assistance specified in Article 9(1)(a) and 9(2); and

(ii) when the reasonably expected time of departure is at least the day after the time of departure previously announced, the assistance specified in Article 9(1)(b) and 9(1)(c); and

(iii) when the delay is at least five hours, the assistance specified in Article 8(1)(a).

2.    In any event, the assistance shall be offered within the time limits set out above with respect to each distance bracket.

17.2.2004          EN          Official Journal of the European Union          L 46/5

*Article 7*

**Right to compensation**

1.    Where reference is made to this Article, passengers shall receive compensation amounting to:

(a) EUR 250 for all flights of 1 500 kilometres or less;

(b) EUR 400 for all intra-Community flights of more than 1 500 kilometres, and for all other flights between 1 500 and 3 500 kilometres;

(c) EUR 600 for all flights not falling under (a) or (b).

In determining the distance, the basis shall be the last destination at which the denial of boarding or cancellation will delay the passenger's arrival after the scheduled time.

2.    When passengers are offered re-routing to their final destination on an alternative flight pursuant to Article 8, the arrival time of which does not exceed the scheduled arrival time of the flight originally booked

(a) by two hours, in respect of all flights of 1 500 kilometres or less; or

(b) by three hours, in respect of all intra-Community flights of more than 1 500 kilometres and for all other flights between 1 500 and 3 500 kilometres; or

(c) by four hours, in respect of all flights not falling under (a) or (b),

the operating air carrier may reduce the compensation provided for in paragraph 1 by 50 %.

3.    The compensation referred to in paragraph 1 shall be paid in cash, by electronic bank transfer, bank orders or bank cheques or, with the signed agreement of the passenger, in travel vouchers and/or other services.

4.    The distances given in paragraphs 1 and 2 shall be measured by the great circle route method.

*Article 8*

**Right to reimbursement or re-routing**

1.    Where reference is made to this Article, passengers shall be offered the choice between:

(a) — reimbursement within seven days, by the means provided for in Article 7(3), of the full cost of the ticket at the price at which it was bought, for the part or parts of the journey not made, and for the part or parts already made if the flight is no longer serving any purpose in relation to the passenger's original travel plan, together with, when relevant,

— a return flight to the first point of departure, at the earliest opportunity;

(b) re-routing, under comparable transport conditions, to their final destination at the earliest opportunity; or

(c) re-routing, under comparable transport conditions, to their final destination at a later date at the passenger's convenience, subject to availability of seats.

2.    Paragraph 1(a) shall also apply to passengers whose flights form part of a package, except for the right to reimbursement where such right arises under Directive 90/314/EEC.

3.    When, in the case where a town, city or region is served by several airports, an operating air carrier offers a passenger a flight to an airport alternative to that for which the booking was made, the operating air carrier shall bear the cost of transferring the passenger from that alternative airport either to that for which the booking was made, or to another close-by destination agreed with the passenger.

*Article 9*

**Right to care**

1.    Where reference is made to this Article, passengers shall be offered free of charge:

(a) meals and refreshments in a reasonable relation to the waiting time;

(b) hotel accommodation in cases

— where a stay of one or more nights becomes necessary, or

— where a stay additional to that intended by the passenger becomes necessary;

(c) transport between the airport and place of accommodation (hotel or other).

2.    In addition, passengers shall be offered free of charge two telephone calls, telex or fax messages, or e-mails.

3.    In applying this Article, the operating air carrier shall pay particular attention to the needs of persons with reduced mobility and any persons accompanying them, as well as to the needs of unaccompanied children.

*Article 10*

**Upgrading and downgrading**

1.    If an operating air carrier places a passenger in a class higher than that for which the ticket was purchased, it may not request any supplementary payment.

2.    If an operating air carrier places a passenger in a class lower than that for which the ticket was purchased, it shall within seven days, by the means provided for in Article 7(3), reimburse

(a) 30 % of the price of the ticket for all flights of 1 500 kilometres or less, or

Official Journal of the European Union

(b) 50 % of the price of the ticket for all intra-Community flights of more than 1 500 kilometres, except flights between the European territory of the Member States and the French overseas departments, and for all other flights between 1 500 and 3 500 kilometres, or

(c) 75 % of the price of the ticket for all flights not falling under (a) or (b), including flights between the European territory of the Member States and the French overseas departments.

## Article 11

### Persons with reduced mobility or special needs

1. Operating air carriers shall give priority to carrying persons with reduced mobility and any persons or certified service dogs accompanying them, as well as unaccompanied children.

2. In cases of denied boarding, cancellation and delays of any length, persons with reduced mobility and any persons accompanying them, as well as unaccompanied children, shall have the right to care in accordance with Article 9 as soon as possible.

## Article 12

### Further compensation

1. This Regulation shall apply without prejudice to a passenger's rights to further compensation. The compensation granted under this Regulation may be deducted from such compensation.

2. Without prejudice to relevant principles and rules of national law, including case-law, paragraph 1 shall not apply to passengers who have voluntarily surrendered a reservation under Article 4(1).

## Article 13

### Right of redress

In cases where an operating air carrier pays compensation or meets the other obligations incumbent on it under this Regulation, no provision of this Regulation may be interpreted as restricting its right to seek compensation from any person, including third parties, in accordance with the law applicable. In particular, this Regulation shall in no way restrict the operating air carrier's right to seek reimbursement from a tour operator or another person with whom the operating air carrier has a contract. Similarly, no provision of this Regulation may be interpreted as restricting the right of a tour operator or a third party, other than a passenger, with whom an operating air carrier has a contract, to seek reimbursement or compensation from the operating air carrier in accordance with applicable relevant laws.

## Article 14

### Obligation to inform passengers of their rights

1. The operating air carrier shall ensure that at check-in a clearly legible notice containing the following text is displayed in a manner clearly visible to passengers: 'If you are denied boarding or if your flight is cancelled or delayed for at least two hours, ask at the check-in counter or boarding gate for the text stating your rights, particularly with regard to compensation and assistance'.

2. An operating air carrier denying boarding or cancelling a flight shall provide each passenger affected with a written notice setting out the rules for compensation and assistance in line with this Regulation. It shall also provide each passenger affected by a delay of at least two hours with an equivalent notice. The contact details of the national designated body referred to in Article 16 shall also be given to the passenger in written form.

3. In respect of blind and visually impaired persons, the provisions of this Article shall be applied using appropriate alternative means.

## Article 15

### Exclusion of waiver

1. Obligations vis-à-vis passengers pursuant to this Regulation may not be limited or waived, notably by a derogation or restrictive clause in the contract of carriage.

2. If, nevertheless, such a derogation or restrictive clause is applied in respect of a passenger, or if the passenger is not correctly informed of his rights and for that reason has accepted compensation which is inferior to that provided for in this Regulation, the passenger shall still be entitled to take the necessary proceedings before the competent courts or bodies in order to obtain additional compensation.

## Article 16

### Infringements

1. Each Member State shall designate a body responsible for the enforcement of this Regulation as regards flights from airports situated on its territory and flights from a third country to such airports. Where appropriate, this body shall take the measures necessary to ensure that the rights of passengers are respected. The Member States shall inform the Commission of the body that has been designated in accordance with this paragraph.

17.2.2004        EN        Official Journal of the European Union        L 46/7

2.    Without prejudice to Article 12, each passenger may complain to any body designated under paragraph 1, or to any other competent body designated by a Member State, about an alleged infringement of this Regulation at any airport situated on the territory of a Member State or concerning any flight from a third country to an airport situated on that territory.

3.    The sanctions laid down by Member States for infringements of this Regulation shall be effective, proportionate and dissuasive.

## Article 17

### Report

The Commission shall report to the European Parliament and the Council by 1 January 2007 on the operation and the results of this Regulation, in particular regarding:

— the incidence of denied boarding and of cancellation of flights,

— the possible extension of the scope of this Regulation to passengers having a contract with a Community carrier or holding a flight reservation which forms part of a 'package tour' to which Directive 90/314/EEC applies and who depart from a third-country airport to an airport in a Member State, on flights not operated by Community air carriers,

— the possible revision of the amounts of compensation referred to in Article 7(1).

The report shall be accompanied where necessary by legislative proposals.

## Article 18

### Repeal

Regulation (EEC) No 295/91 shall be repealed.

## Article 19

### Entry into force

This Regulation shall enter into force on 17 February 2005.

This Regulation shall be binding in its entirety and directly applicable in all Member States.

Done at Strasbourg, 11 February 2004.

|  |  |
|---|---|
| *For the European Parliament* | *For the Council* |
| *The President* | *The President* |
| P. COX | M. McDOWELL |

—————

# EXHIBIT 2

# ALITALIA GENERAL CONDITIONS OF CARRIAGE
# (PASSENGERS AND BAGGAGE)
### 2005 edition

**CONTENTS**

- GENERAL PROVISIONS
- I DEFINITIONS
- II APPLICABILITY
- III TICKETS
- IV FARES AND CHARGES
- V RESERVATIONS
- VI CHECK-IN AND BOARDING
- VII REFUSAL AND LIMITATION OF CARRIAGE
- VIII BAGGAGE
- IX RESTRICTIONS REGARDING CONTENTS OF BAGGAGE
- X SCHEDULES, DELAYS, CANCELLATIONS
- XI REFUNDS
- XII CONDUCT ABOARD
- XIII ADDITIONAL SERVICES
- XIV ADMINISTRATIVE FORMALITIES
- XV SUCCESSIVE CARRIERS
- XVI CARRIER'S LIABILITY FOR DEATH OR
  INJURIES OF PASSENGERS
- XVII CARRIER'S LIABILITY FOR DAMAGE TO BAGGAGE
- XVIII CARRIER'S LIABILITY FOR DAMAGE
  DUE TO DELAY IN CARRIAGE OF PASSENGERS AND BAGGAGE
- XIX UNIFORM RULES REGARDING CARRIER'S LIABILITY
- XX TIME LIMITATION ON CLAIMS AND ACTIONS
- XXI MODIFICATIONS AND WAIVERS

## GENERAL PROVISIONS

## OBJECT OF THE ALITALIA GENERAL CONDITIONS OF CARRIAGE ("G.C.C.").

The G.C.C. rule the contract for the performance of the general economic interest service consisting in the air carriage of persons and baggage on scheduled flights (the "Contract").

Pursuant to the Contract, Alitalia, as contracting carrier (the "Carrier"), undertakes, upon payment of the applicable fares, to :

- provide the passenger with the agreed carriage according to the defined itinerary and schedule, carrying the passenger and his/her baggage from the place of departure to the place of destination;
- provide the passenger with a seat on the aircraft and to supply him/her with food, where necessary, depending on the duration of the flight;
- ensure passenger's safety and protection of his/her personal properties;
- take custody of passenger's checked baggage;
- perform all other services accessory to carriage where necessary or agreed.

The passenger is required:

- to pay the price of carriage unless Carrier's service is provided free of charge;
- to comply with all instructions and warnings that the Carrier may give with respect to the flight.

For flights departing from, arriving in, or with a stopover in Italy, the Contract is based on:

- the principles ratified by the Public Service Plan for the Transportation Industry, or "Transportation Plan" (Carta dei Servizi Pubblici del Settore Trasporti - "Carta della Mobilità"), according to the general reference scheme drawn up by the Department of Public Administration, in agreement with the Ministry of Transport and Navigation, and emanated with the Decree of the Prime Minister of 30 December 1998, published in the ordinary Supplement to the Official Gazette of the Italian Republic, no. 26, of 2 February 1999;
- the principles of the Alitalia Service Plan;
- the Alitalia Airline Passenger Service Commitment (APSC).

A summary of Contract clauses is shown on the ticket.

OTHER KINDS OF AIR TRANSPORT TO WHICH THE G.C.C. ARE APPLICABLE

CHARTER FLIGHTS AND GRATUITOUS CARRIAGE

The provisions of the G.C.C. apply, to the extent enforceable, also to charter flights as well as gratuitous or discount fare carriage provided by the Carrier.

ACTUAL CARRIAGE AND/OR SUB-CARRIAGE

Likewise, the provisions of the G.C.C. apply in case of actual carriage and/or subcarriage where possible, according to the effective rules and regulations.

Such situations occur in the event of air carriage done by a carrier other than the contracting carrier, which, although not being an agent or servant of the contracting carrier, performs, pursuant to an agreement with same (for example: code sharing, franchising, leasing, etc.), in whole or in part, the

2

carriage agreed with the passenger.

CARRIAGE PERFORMED BY SUCCESSIVE CARRIERS (CUMULATIVE CARRIAGE)

If the passenger and the Carrier agree that carriage is to be performed by successive carriers (one of which is the Carrier) as a single carriage, the Contract provisions will apply only to the carriage performed by the Carrier when only one ticket is issued as well as when a conjunction ticket is issued.

The Carrier is only liable for damage occurring during carriage on flights or segments of flights for which the box on the ticket for the identification of the CARRIER – performing that flight or segment of flight – bears the Alitalia identification code, even if carriage is performed by an actual carrier or sub-carrier in Carrier's name and on its behalf.

If the Carrier issues a ticket or accepts baggage for carriage by another carrier, it acts only as such carrier's agent; therefore, the Carrier will not be liable for any damage occurring during such carriage.

Nevertheless, with regard to checked baggage, the passenger has the right to file a lawsuit against the first or last carrier as well as against the carrier that performed the carriage during which his/her baggage was destroyed, lost, damaged, or delayed. Carriers are liable jointly and severally to the passenger.

ACCESSORY AND/OR SUBSTITUTE CARRIAGE

Contract provisions do not apply to any kind of carriage performed outside an airport, except as may be strictly necessary for the boarding, disembarking, or transfer of passengers and baggage, in relation with the performance of air carriage agreed with the Carrier, and subject to the condition that such accessory carriage be performed in Carrier's name and on its behalf, for connections limited to the immediate closeness of an airport, and subject to the sole liability of the party performing such carriage (if other than the Carrier).

Likewise, Contract provisions do not apply to any kind of carriage other than air carriage that the Carrier offers to perform with its own or third-party means outside an airport in substitution of aircraft if aircraft are unavailable.

COMBINED CARRIAGE

In case of combined carriage performed partly with an aircraft and partly with any other mean of transport, the Contact provisions apply only to the air carriage performed by the Carrier.

# ARTICLE I
# DEFINITIONS

Unless otherwise expressly indicated, the terms and definitions used in these G.C.C. have the following meaning:

**Agents or servants**

Means individuals, organisations, or companies other than the Carrier (see) and its employees that provide passenger (see) with air transport services and services auxiliary or accessory to transport in the name and on behalf of the Carrier (see), including (for purposes of example only) travel agents, handling agents, airport managing bodies, catering operators, etc.

They often act independently from the Carrier and can be directly liable for any damage caused to passengers.

**Agreed stopping place**

Means an interruption of travel at an intermediate place (i.e., at a place other than that of departure and destination), specified on the ticket (see) or on Carrier's timetables as a scheduled stopover during the itinerary, as previously agreed between the passenger and the Carrier (see).

**Air carriage**

Means, for purposes of the Contract, the period during which the Carrier (see) provides the service agreed with the passenger. Such period begins from the start of boarding operations and finishes at the end of disembarking operations (see).

**Animals**

Means the live domestic animals that the passengers (see) bring with them. Depending on their kind, weight, and size, animals may be transported in the passenger cabin or in specific compartments in the cargo hold (see) of the aircraft.

In the latter case, animals are considered as excess checked baggage (see).

**Applicable regulations**

This definition refers mainly to the following:

− with regard to obligations taken under the contract of carriage, to the rules governing the relationship between the Carrier (see) and the passenger (see) and the consumer (see) protection pursuant to the Italian Civil Code, which consists of the rules approved by Italian Royal Decree 16 March 1942, no. 262, as subsequently modified and amended;

− with regard to some aspects pertaining to stipulation of the contract of carriage via computer, to Italian Legislative Decree 9 April 2003, no. 70, implementing EC Directive 2000/31 regarding some legal aspects of IT services;

− with regard to other civil and administrative obligations of the Carrier and to criminal and disciplinary provisions applicable to air carriage, to the Italian Navigation Code, which consists of all of the rules approved with Italian Royal Decree 30 March 1942, no. 327 and subsequent modifications;

− with regard to the system and limits of civil liability of the Air Carrier:

a) to the Montreal Convention, understood as the Convention for the Unification of Certain Rules for International Carriage by Air, signed in Montreal on 28 May 1999 and entered into force in the European Union on 28 June 2004;

b) to EC Regulation no. 2027/97 of 9 October 1997 on the liability of the Air Carrier in case of accident, as modified and supplemented by EC Regulation no. 889/02 of 13 May 2002;

- with regard to the Carrier's obligations concerning the compensation and assistance of passengers in the event of denied boarding, cancellation of flight, or long delay, to EC Regulation no. 261/2004 of the European Parliament and Council of 11 February 2004;

- with regard to the right to privacy, to Italian Legislative Decree 30 June 2003, no. 196, entitled "Code for the protection of personal information;"

- with regard to the security of air carriage and all other aspects concerning methods of providing carriage, understood as a service of general economic interest, to:

  - provisions of law;

  - regulations;

  - orders issued by competent public authorities, as well as national or international bodies or organisations with regulatory powers;

  - rules or instructions of the Carrier;

that are adequately and reasonably knowable by the passenger, such as, for purposes of example only, the J.A.R. (Joint Aviation Requirements) and regulations issued by the Comitato Interministeriale per la Sicurezza (C.I.S.) (Italian Interdepartmental Commission for Security) or by similar bodies.

The Carrier (see) must also conform to the rule concerning "all-inclusive" travel, holidays, and tours referred to in EC Directive no. 90/314, implemented in Italy with Legislative Decree no. 111/95, to the extent that such rule contains provisions applicable to the air contract of carriage.

**Authorised Agent**

Means a travel agent appointed by the Carrier (see) to sell air transportation services to passenger and to represent the Carrier (see) with respect to such passenger (see). The authorised Agent may be an individual or a company operating as an independent entity or even another carrier.

**Baggage**

Means such articles, effects and other personal belongings of a passenger as are necessary or appropriate for wear, use, comfort or convenience in connection with his/her trip, and which the Carrier (see) brings along with the passenger performing an obligation accessory to the passenger (see) contract of carriage.

Unless otherwise specified, it shall include both checked and unchecked baggage (see) of the passenger (see).

**Baggage check**

Means the document issued to the passenger (see) as proof of consignment of checked baggage (see) to the Carrier (see), matched by a baggage identification tag attached to the baggage itself.

It shows the passenger's name and number, as well as the weight of the baggage checked in his/her name.

**Boarding (or embarking) and disembarking operations**

Means the operations conducted by the Carrier (see) or by its agents and servants to transfer passengers from the air terminal to the aircraft and vice versa.

With regard to passengers and unchecked baggage (see):

– boarding operations begin when passengers leave the air terminal gate and end when they enter

5

the aircraft;

– disembarking operations begin when passengers leave the aircraft and end when they enter the air terminal.

With regard to checked baggage (see):

– boarding operations begin when baggage is received by the Carrier or by its agents and servants and end when baggage is loaded into the aircraft;

– disembarking operations begin when baggage is unloaded from the aircraft and end when baggage is returned to passengers by placement on delivery belts.

**Cabin**

Means the part of the aircraft that contains passengers and unchecked baggage (see).

**Cargo Hold**

The part of the aircraft used to contain checked baggage, cargo, and mail.

**Carrier**

Means the legal person that performs air carriage.

Distinction must be made between the **contracting carrier** and the **actual** carrier.

The contracting carrier is the carrier that issues the ticket as a party to the contract of carriage (agreed with a passenger or with a person who acts on behalf of the passenger), by which the transport of the passenger and/or of his/her baggage is performed or committed to be performed, and that is liable for default or partial performance of such carriage.

The actual carrier is every carrier which, by agreement with or authorisation from the contracting carrier, actually provides carriage in whole or in part, but is not a successive carrier (see) pursuant to applicable regulations.

**Carrier's web site**

Means Carrier's web site ([www.alitalia.com](www.alitalia.com)), on which these G.C.C. and other pertinent information are available.

**Checked baggage**

Means the baggage of which the Carrier takes sole custody and for which the Carrier has issued a baggage check.

Such baggage is carried gratuitously if its weight is less than or equal to the free baggage allowance (see), even if it consists of more than one item or piece.

If the weight of checked baggage exceeds the free baggage allowance, the excess will be carried subject to payment of a surcharge, with issuance of an excess baggage ticket (see).

Baggage must always be of reasonable size, weight, shape and dimensions, and placed in containers suitable for its safe carriage and handling (such as, for purposes of example only: suitcases, bags, backpacks, etc.) so that such carriage does not constitute carriage of cargo under applicable law.

**Consumer**

Means a passenger who has purchased an air carriage ticket for a purpose other than his/her professional or business activity in case performed.

**Coupon**

Means the flight coupon (see) as well as the passenger coupon or receipt (see).

**Damage**

Means any economically valuable prejudice or harm to the passenger (see) or to his/her property caused by:

− an event occurring during the air carriage;

− default or incorrect performance of the Carrier's services.

It must consist of attested, actual, economically valuable prejudice to the passenger's physical safety or to his/her property or the property of his/her assigns, with immediate effect (accruing damage) and/or causes loss of future earnings (missed profit), with exclusion of indirect or consequential damages.

**Denied boarding**

Means Carrier's refusal to board a passenger (see) on a flight (see), even though the passenger has a confirmed reservation for the flight in question, is present for boarding in the prescribed manner and at the time indicated in writing (or electronically) by the Carrier or by a tour operator or by an authorised travel agent or, in the absence of a specified presentation time limit, at least 45 minutes before the published departure time, unless there are reasonable grounds to deny boarding, such as health, safety reasons or inadequate travel documentation, etc.

**Electronic coupon (e-coupon)**

Means a series of electronic data pertaining to the flight (see) for which the Contract is stipulated, contained in Carrier's computer systems, as well as in those of its agents and auxiliaries, or of other carriers that perform carriage in its place and on its behalf.

**Excess baggage ticket**

Means the document issued by the Carrier, or in its name and on its behalf by authorised agents, as receipt of payment for carriage of baggage exceeding the free baggage allowance (see) and for carriage of animals in the cargo hold of the aircraft.

**Fares**

Means the published fares, duly authorised by competent authorities if necessary, and available through the Carrier's distribution channels or on its web site.

Fares are shown in the appropriate box of the ticket (see).

They are part of the total price that the passenger pays to the Carrier for the agreed carriage, along with any supplements, taxes and other expenses imposed by law.

Fares may involve specific conditions and/or restrictions – called "Fare Rules" – with regard to:

− ticket validity and duration;

− reservations and ticket issuance;

− ticket refund rules;

that may integrate or change the provisions of these G.C.C.; the customer is informed of any integration or change from time to time when a ticket (see) is purchased.

**Fare rules**

**See Fares**

**Flight or Travel**

Means the itinerary of the agreed carriage, which may consist of one or more segments (see).

**Flight coupon**

Means the portion of the ticket (see) bearing the notation "valid for carriage" (or, in case of electronic ticket, the electronic coupon) that specifies the places between which the passenger (see) has the right to be carried.

**Free baggage allowance**

Means the free modality of carriage of checked baggage.

Information on specific free baggage allowance are available at Carrier's offices open to the public, through its product distribution channels, and on the Carrier's website.

**Full-fare ticket**

Means a ticket (see) valid for one year to which no special conditions or specific restrictions apply.

**I.A.T.A.**

Means the International Air Transport Association, private legal entity of which most of the world's commercial airlines are members. More information about it are available on the website www.iata.org.

**I.C.A.O.**

Means the International Civil Aviation Organisation, an agency of United Nations dealing with the regulation of civil aviation. Information is available on the website www.icao.int.

**Itinerary receipt**

Means the document granted to the passenger (see) in case of issuance of an e-ticket, containing his/her name and other useful flight information.

**MCO**

Means "Miscellaneous Charges Order," i.e., a coupon that makes the bearer use of various services provided by the Carrier.

**Passenger**

Means any individual who is not a member of the flight crew or cabin crew of the flight in question, carried or to be carried on an aircraft with Carrier's consent, normally upon payment of the applicable fare.

**Passenger coupon or receipt**

Means the portion of the ticket to be retained by the passenger.

**SDR ("Special Drawing Rights")**

Means a unit of account created by the International Monetary Fund in order to have a unified and homogeneous currency for international commercial transactions, the value of which is reported on major financial newspapers or on the Internet.

**Segment**

Means each and every national, international, or intercontinental leg of a flight.

**Stopover**

means a scheduled stop on your journey, at a point between the place of departure and the place of

destination.

## TCV

Means "Ticket Credit Voucher", i.e., a voucher that allows the holder to request the issuance of Carrier's tickets for the amount indicated on the voucher itself.

## Ticket

Means the document entitled "Passenger Ticket and Baggage Check" issued by or on behalf of the Carrier by authorised agents, reporting a summary of these G.C.C. and other required information, and the flight and passenger coupon.

The ticket constitutes the written proof of stipulation of the contract of air carriage as required by law.

The ticket shows the place and date of issuance, the place and time of departure and the place of destination of the carriage, the class and price of carriage, the passenger's name, the Carrier's name and address, and the weight of checked baggage. It also shows any supplemental fare, tax, or accessory expense that the passenger is obligated to pay to the Carrier.

The Carrier may be indicated on the ticket with initials or an identification code of two or three letters, according to IATA criteria.

The ticket may consist:

- of a "paper" document that includes all of the various flight coupons and the passenger coupon;
- of various documents attesting the issuance of an "electronic" ticket, such as, for example, itinerary receipt, electronic coupon, boarding pass, etc.

Any carrier that issues a ticket or accepts checked baggage for carriage on the flights of another carrier (such other carrier being the contracting carrier) is to be considered only an agent of the contracting carrier.

The carrier that act as an agent, therefore, assumes no liability for any default or damage caused to the passenger by the contracting carrier, or for any non-conformity between the principles of compensation applied by the contracting carrier and those shown on the issued ticket.

Conjunction ticket means two or more tickets concurrently issued to a passenger and which together constitute a single contract of carriage.

## Time limits

Means time reference points starting from which (commencement) during which (current period) or until which (deadline) the rights, obligations and provisions contained in the Contract may be exercised, must be performed, or produce their effects.

Time limits may refer to commonly known dates or to a specific day, or to times, days, months, or years.

When time limits are expressed in days, expiration occurs at the conclusion of the final day without computing the first day (for example, for purposes of determining the period of validity, the day on which the ticket was issued or on which carriage began is not computed).

When time limits are expressed in months, expiration occurs at the conclusion of the final month without consideration of the number of days in each month. When the final month lacks the day corresponding to that of the first month, the deadline is the last day of the final month. When the deadline falls on a holiday, it is extended by right to the first working day thereafter.

**Unchecked baggage**

Means any baggage or animal that is not checked, and therefore not consigned to the Carrier, and that can be carried gratuitously in the passenger cabin.

Nevertheless, unchecked baggage will be allowed in the cabin only if its dimensions are within the limits defined by applicable regulations; otherwise, such baggage must be handled as checked baggage.

# ARTICLE II
## APPLICABILITY

Without prejudice to the general provisions on other types of air carriage to which the Contract is applicable, these G.C.C. apply to all flights or segments of flights performed by the Carrier with destinations either within or beyond the European Union for which the Carrier's name or identification code appears in the box of the ticket issued for such flights or segments of flights.

If carriage is performed pursuant to a charter contract of carriage, the G.C.C. will apply only if expressly referred to in the contract and in the ticket.

With regard to some flights, the Carrier may have stipulated "code sharing" agreements with other airlines. This means that even if the passenger has made a reservation on one of Carrier's flights and holds a ticket stating that the Carrier – shown with its name or IATA code – is the carrier that will perform the flight, it is nevertheless possible that another carrier may actually provide such service. In such case, the Carrier (that assumes the role of marketing carrier) will notify the passenger of the identity of the operating carrier at the time of reservation.

In case of conflict between these G.C.C. and Carrier's Fare Rules or applicable regulations, such regulations will prevail over these G.C.C..

The invalidity of any clause of these G.C.C. according to applicable regulations will not affect any other clause of these G.C.C..

These G.C.C. are subject to change and amendment for purposes of compliance with applicable regulations. The text of the G.C.C. reported on Carrier's website is the sole text to be kept into consideration for purposes of identifying the exact content of the Contract.

Subject to the terms of these G.C.C., in case of non compliance between same and any of Carrier's procedures having a specific object, these G.C.C. will prevail over such procedure.

# ARTICLE III

## TICKETS

3.1. The Carrier will provide carriage, or refund the price thereof, only for the Passenger whose name appears on the ticket and legally holds the same. For reasons of security, the Carrier has the right to check if the person presenting the ticket is actually the person whose name appears on such ticket.

In all cases, the ticket is and remains the property of the issuing Carrier.

If the ticket is presented by a person other than the passenger having the right to be carried or refunded, the Carrier (subject to its right to withdraw the ticket) will neither perform carriage nor refund the person who presents the ticket.

3.2. If the ticket is not electronic, it will show only a summary of these G.C.C., the full text of which is available on Carrier's website.

The ticket constitutes the documental proof of stipulation of the contract of carriage between the Carrier and the passenger indicated on the ticket.

The ticket is not a credit instrument and is not transferable by inter vivos act or for cause of death. Nevertheless, the rules pertaining to package travel, package holidays and package tours, regulated by EC Directive 90/314, implemented in Italy with Legislative Decree no. 111/1995, are valid to the extent applicable.

3.3. Unless the ticket is electronic, a passenger is not entitled to be carried unless he/she presents a valid ticket with the flight coupon for the flight in question, all other flight coupons unused, as well as the passenger coupon. In addition, the passenger is not entitled to be carried if the ticket presented is mutilated, if it has been forged, or if it has been altered by anyone other than agents authorised by the Carrier. If the ticket is electronic, the passenger has no right to carriage unless he/she provides data confirming that such ticket has been validly registered in his/her name.

Considering its economic value, the passenger must take care of the ticket with due diligence and take appropriate measures to prevent its total or partial loss and its theft.

In case of loss, theft, or total or partial destruction of the ticket, it will be reimbursed or replaced subject to the terms and conditions stated in Article XI.

3.4. Some tickets are sold at discounted or special fares and may be non-reimbursable in whole or in part.

The Carrier will adequately inform the passenger about the reimbursability of such fares and about the applicable fare rules.

In all cases, the passenger must use due diligence when choosing the most appropriate fare for his/her needs.

3.5. If the passenger holds a ticket entirely unused, that is non-reimbursable in whole or in part, and he/she is unable to travel due to a cause of force majeure, the Carrier will – provided the passenger immediately gives notice of such situation and subject to proof of such cause – grant the passenger a TCV for the amount of the non-reimbursable fare, to be used to purchase one or more tickets from the Carrier, net a reasonable service charge for issuing the ticket(s).

3.6. Unless otherwise stated on the ticket, in these G.C.C., and in applicable fare rules, which may change the term of validity of the ticket (in which case such changed term will be shown on the ticket), a ticket is valid for:

(a) one year from the issue date; or

(b) subject to the travel of the first leg within one year from the issuance date, one year from the date of the travel of the first leg specified on the ticket.

3.7. If the passenger is unable to begin travel within the term of validity of the ticket because at the time the passenger requested reservation the Carrier was unable to confirm such reservation, the term of validity of the ticket will be extended or the passenger will be entitled to a refund pursuant to the terms of Art. XI below.

3.8. If the passenger is unable to begin travel or, after having begun it, is unable to complete it within the term of validity of the ticket due to illness, the Carrier will extend the validity of the ticket to the day on which the passenger, based on a medical certificate – which must be provided to the Carrier – is able to travel or to the first flight following such date, departing from the place from which travel should have begun or starts again and on which there is a seat available in the class for which the fare had been paid.

Validity of the ticket will be extended for no more than three months from the date of the medical certificate if the ticket (whether paper or electronic) foresees one or more stopovers.

In the above-described cases, the Carrier will also extend the period of validity of the tickets belonging to the ill passenger's family unit members or companions who, in case, travel with him/her, or to other similar accompanying persons.

3.9. If the passenger dies during travel, the ticket of the person (if any) travelling with him/her may be changed by eliminating the minimum stay condition or by extending its term of validity.

In case of death, at the agreed stopping place or destination of travel, of immediate family members, spouse or companion of the passenger who has already begun travel, the validity of the passenger's ticket, as well as that of his/her immediate family members, spouse or companion who may be accompanying him/her, may likewise be changed.

Changes will be made upon presentation of a suitable death certificate; the term of validity of the ticket may not be extended for more than 45 (forty-five) days after the date of death.

3.10. The ticket purchased by the passenger is valid only for the segment or segments specified on the ticket, from the place of departure to the place of destination, including any agreed stopping place. The fare paid by the passenger refers to carriage as specified on the ticket. The fare and applicable rule, as defined in Art. I, form an integral and essential part of the Contract.

The passenger will not have any right to carriage if the flight coupons are not used in the order called for by the ticket, or if the passenger starts travel from one of the intermediate stopovers or from one of the agreed stopping places, unless the passenger gives the Carrier prior notice of his/her intention and receives approval therefor.

It is forbidden to use flight coupons from different tickets for purposes of evading the Carrier's fare rules.

3.11. The passenger must give the Carrier suitable advance notice if he/she wishes to change the itinerary or any other aspect of the Contract. If such change is possible and implies an increased fare, the passenger will be suitably notified of such increase so that he/she may choose to accept or reject it. If the passenger has to change an aspect of the contracted carriage due to causes of force majeure, he/she must give the Carrier suitable advance notice of the expected departure date. The

Carrier will do its best to carry the passenger to the first agreed stopping place or to the final destination without changing the previously paid fare.

3.11.1 If the passenger intends to change the original carriage without Carrier's consent, the passenger will be charged the fare for the changed carriage. The passenger will have to pay any difference between the fare paid and the fare applicable to the changed carriage, if higher. The Carrier will refund the passenger for the difference if the new applicable fare is lower. If the passenger does not pay the higher difference in fare, the unused flight coupons will not be honoured.

3.12. Some changes (such as choosing a new place of departure in case of non-use of the first flight coupon or reversing the direction of travel once begun) may imply a fare increase. Many fares are valid only on the dates and for the flights indicated on the ticket, and cannot be changed at all, or can be changed only upon payment of a surcharge.

3.13. Each flight coupon in the ticket will be accepted and collected by the Carrier for carriage in the service class on the date and for the flight on which the seat was reserved. If a ticket was originally issued without a reservation having been specified, the seat for such ticket may be reserved at a later date if permitted by the fare rule applicable to the passenger's chosen ticket and if there is an available seat on the passenger's chosen flight.

If the passenger does not use the reserved seat and does not notify the Carrier sufficiently in advance, the Carrier may cancel, or ask another carrier to cancel, reservations for subsequent flights or for the return flight.

3.14. Subject to laws regarding mandatory indications in corporate acts and correspondence, Carrier's name may appear in abbreviated form on the ticket and, specifically, may be reduced to the Carrier's identification code. Unless otherwise specified, for purposes of carriage Carrier's address will be considered the airport of departure indicated next to the first abbreviation of Carrier's name in the box on the ticket marked "CARRIER" or, in case of electronic ticket, indicated for Carrier's first flight segment on the Itinerary Receipt.

The company's registered office, the register of companies at which the company is registered, the registration number, and the total share capital are indicated in Carrier's documents and correspondence.

# ARTICLE IV

# FARES AND CHARGES

Fares apply only to carriage from the airport of departure to that of the final destination unless expressly stated to the contrary. Fares do not include ground transport services between airports and between airports and city terminals. The fare paid by the passenger will be calculated on the basis of Carrier's fare rules in force on the date the ticket is paid, for carriage to be performed on the dates and according to the itinerary specified thereon. If the passenger changes the itinerary or the dates, he/she may be required to pay a supplement.

The fare rules applicable from time to time are available at the Carrier offices open to the public, through its product distribution channels, and on Carrier's website.

If more than one itinerary is available at the same fare, the passenger has the right to arrange his/her preferred itinerary with the Carrier before the ticket is issued; such itinerary becoming that to be retained definitive.

The passenger will pay all taxes and other additional charges applicable to carriage, not included in the fares, imposed by law or required by governmental authorities or by other competent authorities. The passenger will be informed of such taxes and charges when the ticket is purchased. Taxes and charges on air services are subject to constant change and, therefore, if any tax or charge stated on the ticket is increased, or if a new tax or new charge is applied after the ticket has been issued, the passenger will be required to pay the higher amount deriving from such increase or application up to the date of beginning of the travel. If any taxes or charges that the passenger duly paid to the Carrier when the ticket was issued, or subsequently up to the date of beginning of the travel, are reduced or abolished up to the date of beginning of the travel, the passenger has the right to request refund of the amount so paid.

The Carrier is not liable for any supplements for services connected to the issuance of tickets that may be requested by its agents or servants (such as travel agents).

Fares, taxes and other additional charges are payable in the currency of the country in which the ticket was issued, unless the Carrier or its agents, representatives and servants request, before or at the time the ticket is paid for, that, for just cause or other legitimate reason, payment be made in another currency (for example, due to non-convertibility of the local currency).

# ARTICLE V
## RESERVATIONS

5.1. The Carrier or its authorised agents will record the passenger's reservation and give the passenger written confirmation if so requested by him/her.

Only the reservation confirmed in the system that the Carrier uses to record reservations for its flights will be considered valid. The Carrier will not be liable for any damage caused by lack of or mistaken recording if not attributable to Carrier's own negligence or with intent.

Some fare rules may include conditions that limit or exclude the passenger's right to cancel or change reservations on Carrier's flights.

5.2. If the passenger does not pay the ticket price before the deadline for its issuance, as specified by the Carrier or by its authorised agents at the time of reservation, the Carrier may cancel the confirmed reservation.

5.3. At the time of reservation, the Carrier offers the passenger the option of choosing a specific seat on its aircraft. The Carrier will endeavour to honour such advance seating requests; nevertheless, if the aircraft to be used for a certain flight is replaced or modified, the Carrier will not guarantee the specific assignment of any seat, even if such assignment has been confirmed.

In addition, the Carrier reserves the right to change the assignment of, or to reassign, seats on its aircraft at any time, even after departure, if required for safety reasons.

5.4. If, for reason attributable to the passenger, the confirmed reservation is not cancelled by same by the deadline indicated by the Carrier or lapses due to failure to respect the rules referred to in Art. VI below, the Carrier may require the passenger to pay a penalty to cover expenses incurred, provided the fare paid permits the passenger to book another flight.

5.5. Reservations for intermediate or return flights may be subject to confirmation within time limits specified by the Carrier. The passenger has the right to be informed by the Carrier or by its agents as to when and how the passenger must confirm reservations for intermediate or return flights.

If a passenger does not use a reservation on a flight without first notifying the Carrier, the Carrier may cancel the reservations for intermediate or return flights. On the other hand, if the passenger gives the Carrier timely notice, the Carrier will not cancel the reservations for intermediate or return flights.

Likewise, if the Carrier requests confirmation and the passenger does not confirm, the Carrier may cancel the reservations for intermediate or return flights. Nevertheless, if the passenger gives the Carrier timely notice that he/she is still interested in utilising the intermediate or return flights, and subject to availability of seating on the aircraft, the Carrier will restore the reservation and provide carriage for the passenger. If seating is not available on the date chosen by the passenger, the Carrier will do everything possible to carry the passenger to the next destination or the final destination on the next flight on which seating is available.

5.6. Through its reservation operations and passenger check-in, the Carrier acquires personal data from passengers necessary to perform contractual obligations in respect of the same passengers.

The performance of such obligations necessarily entails that such data are accessed by Carrier's operative and commercial personnel, as well as by third-party service providers, the first as "Persons in Charge of the Processing" and the second as "Data Processors".

The Carrier, as "Data Controller" for the subject data treatment, managed mostly through computers, informs its customers that such data will be used exclusively for the above-described purposes.

For this reason, the passenger authorises the Carrier to store and use such data, and to transmit them to its competent offices, to its authorised agents, to government authorities, to other carriers, and to the service providers referred to above.

Additional information on the identity of the Persons responsible and methods for the processing of personal data, as well as on the passenger's rights regarding treatment of his/her personal data, are available c/o Carrier's authorised agents, product distribution channels, and on the Carrier's website.

17

# ARTICLE VI
## CHECK-IN AND BOARDING

6.1. The time limit for passenger check-in is different at each airport. Therefore, the passenger must find out about such time limits and respect them. Arriving early for check-in allows the Carrier and the passenger to go through formalities in the best manner.

The Carrier or its authorised agents will provide the passenger information on the time limit for check-in for the first flight shown on the ticket. For any and all subsequent flights, the passenger must find out about the time limit for check-in.

6.2. Information on passenger check-in time limits is an integral part of the Contract, and are available from Carrier's official timetable, through distribution channels for the Carrier's products, on Carrier's website, or by contacting the Carrier or one of its authorised agents. If no check-in time is indicated, the passenger must arrive at least 45 minutes prior to the published departure time.

6.3. The Carrier reserves the right to cancel a confirmed reservation if the passenger does not respect the time limit for check-in. This right applies to the first flight indicated on the ticket as well as for subsequent flights.

6.4. The passenger must arrive at the boarding gate no later than the time specified by the Carrier at check-in.

6.5. The Carrier may cancel the reservation if the passenger does not arrive at the boarding gate by the prescribed time.

6.6. With regard to the rules applicable to the management of passengers stand-by lists, reference is made to the effective laws and regulations.

6.7. The Carrier is not liable for any cost or expense incurred by a passenger who has not respected the terms and conditions of this article.

## ARTICLE VII
### REFUSAL AND LIMITATION OF CARRIAGE

The Carrier may refuse to carry any passenger or his/her baggage for security reasons, or if:

a) it deems such action necessary to comply with the laws, regulations, or rules of any country of departure, destination, or to be flown over; or if carriage of his/her baggage could constitute a threat to the security or health of the other passengers, or could concretely make the flight of the other passengers or the crew insufficiently comfortable;

b) passenger's conduct, age, physical or mental state are such as to:

– require special assistance from the Carrier and the methods of such carriage were not agreed with the Carrier in advance; or

– materially affect the comfort or provoke justified complaints from the other passengers; or

– endanger himself/herself or other persons or property; or

c) such action is justified by the passenger's failure to follow instructions legitimately provided by the Carrier, or if the passenger was responsible for illegal or undisciplined conduct on a previous flight and there is risk that such conduct may be repeated;

d) the passenger has refused to submit to security checks;

e) the applicable fares, taxes owed, and any other accessory expense have not been paid, or if the passenger is not in possession of valid travel documents;

f) the passenger does not endorse a valid travel documents required to enter a transit country of the flight or to enter the final country of destination of the flight;

g) the passenger has destroyed his/her travel documents during the flight or has refused to show them to flight crew;

h) the ticket presented by the passenger:

– (i) was obtained illegally or was purchased from a party other than the Carrier or one of its authorised agents; or

– (ii) was reported lost or stolen; or

– (iii) was forged; or

– (iv) was altered or made incomplete by a party other than the Carrier or one of its authorised agents even with regard to a single flight coupon;

- (v) is in the name – specified in the "NAME OF PASSENGER" box – of a person other than the person who presents the ticket

it being understood that in such cases the Carrier reserves the right to withdraw the ticket;

i) the passenger has not respected the requirements referred to in Art. III regarding the progressive order of the flight coupons and their use, or presents a ticket that was issued or was altered in any way by a party other than the Carrier or one of its authorised agents;

j) the passenger has not respected Carrier's flight safety instructions.

Carrier's check-in of unaccompanied minors, disabled persons, pregnant women, ill persons, or other persons requiring special assistance is performed subject to prior agreement with the Carrier,

which must be duly informed by the passenger with regard to special needs at the time of reservation. Disabled passengers who have duly informed the Carrier of their special needs will be carried in conformity to such special needs unless such carriage is impossible due to objective causes of force majeure.

# ARTICLE VIII
# BAGGAGE

The passenger has the right to the carriage of baggage in free allowance within the limits and conditions established by the Carrier from time to time. Such limits and conditions are available on request c/o Carrier's authorised agents, via its product distribution channels, and on Carrier's website.

Pursuant to Transport Ministry Decree no. 1/36 of 28 January 1987 and ENAC (Ente Nazionale per l'Aviazione Civile – National Civil Aviation Board) Instruction APT-09 of 8 May 2001, in addition to checked baggage within the free allowance, for purposes of airport security and flight security, each passenger is permitted free carriage in the cabin – compatible with the capacity of available compartments – of only one piece of hand baggage, identified with a label (with the passenger's name and surname) to be attached by the passenger, provided that the sum of its dimensions (length, height and depth) does not exceed 115 centimetres (about 45,3 inches).

In addition to the above-mentioned hand baggage, the passenger is permitted  - compatible with available space – to carry the following articles on board:

- a handbag or briefcase or a portable personal computer;

- a camera, a video camera, or a CD player;

- an overcoat or a raincoat;

- an umbrella or walking stick;

- a pair of crutches or other walking aid;

- a portable cradle and baby food needed for the flight;

- reading matter;

- articles purchased at "Duty Free" shops and at shops located inside the airport (in limited quantities and weight), provided they are easily stowed in the available compartments on board.

Upon delivery to the Carrier of the baggage to be checked, the Carrier itself takes custody of such baggage and issues a baggage identification tag for each piece of checked baggage.

Checked baggage, within or in excess of the free baggage allowance, is carried on the same aircraft as the passenger unless not possible due to proven safety or operational reasons.

In such case, the Carrier will carry such baggage on the next available flight and will deliver it directly to the passenger.

If checked baggage exceeds the free baggage allowance, the passenger shall pay a charge, the rate of which is available on request c/o Carrier's authorised agents, its product distribution channels, and on the Carrier's website.

The Carrier offers the passenger the option of declaring a value for checked baggage in excess of the applicable limit of liability.

In this case, the passenger will have to pay a supplementary charge.

The Carrier may refuse to accept the declaration of value for checked baggage if part of the carriage is performed by another carrier that does not offer a similar option.

The baggage or other objects that the passenger may take on board must be stowable under the seat in front of the passenger or in the compartments in the passenger cabin.

The Carrier reserves the right to prohibit carriage in the cabin of baggage or objects:

-       whose weight, shape, and/or dimensions are such that they cannot be stowed as described above;

-       conflict with the security requirements of carriage in the cabin.

Baggage and objects not allowed in the cabin will be stowed as checked baggage, with issuance of a baggage identification tag to the passenger, and after the passenger has been allowed to remove from the baggage any objects that cannot be contained in checked baggage.

Baggage and objects that are unsuitable for carriage in the hold (such as, for example, fragile musical instruments and similar objects) can be accepted for carriage only in the passenger cabin if space is available and according to the special procedures specified by the Carrier to guarantee the safety of passengers and the crew.

Carriage of such objects may be subject to special fares.

The Carrier undertakes to ensure that checked baggage will be made available to the passenger for claim as quickly as possible at the place of destination or agreed stopover.

In case the passenger fails to claim his/her baggage, the enforceable law provisions regarding the incapability of Carrier to deliver the carried goods will apply.

## ARTICLE IX
## RESTRICTIONS REGARDING CONTENTS OF BAGGAGE

9.1. The following must not be placed into the baggage:

− items that do not constitute baggage as defined in Art. I of these G.C.C.;

− items that may constitute a hazard for the aircraft or for the persons or property on board, including but not limited to:

  − working electronic devices;

  − briefcases alarm-equipped;

  − compressed gases (deeply refrigerated, flammable, non-flammable, poisonous) such as butane, oxygen, liquid nitrogen, camping gas, aqualung cylinders;

  − corrosive agents such as acids, alkali, mercury and wet cell batteries;

  − explosives, weapons and munitions (unless for hunting or sport), pistol caps, fireworks and flares, as well as all similar looking toys;

  − flammable liquids and solids, such as cigarette lighters and fuel for same, matches, paints, thinners, solvents;

  − other dangerous objects, such as magnetic, hazardous or toxic materials, materials with an irritating or stinking smell, oxidants such as bleaching powder and peroxides;

  − poisons and infectious substances, insecticides, weed killers, and materials with pathogenic agents;

  − radioactive substances;

  − alarm devices and any lithium batteries installed to power them;

  − dry ice;

  − underwater torches with batteries inserted;

− objects whose carriage is prohibited by regulations in force in the country of departure and in destination or in those flown over during carriage;

− items that in Carrier's opinion are unsuitable for carriage due to their weight, shape, size, characteristics or packing;

− live or dead animals, save as provided at point 9 of this Article with regard to animals.

9.2. In general, checked baggage cannot contain objects such as (for purposes of example only): valuable, fragile, or perishable objects, cash, jewels, precious metals, silverware, computers and their accessories, electronic gadgets or devices for personal use, cameras and photographic equipment, negotiable securities, credit instruments, government securities, stock and bond certificates or other securities, work, business, or commercial documents, passports and other personal identification documents, sample collections, heirlooms, antiques, artisanal or antique products, valuables, works of art, rare books, valuable publications or manuscripts.

Firearms and munitions for purposes other than hunting and sport cannot be carried as baggage. Such objects may be carried only in conformity to laws and regulations concerning air transport security.

Biological liquids such as (for purposes of example only) blood, urine, semen, etc., cannot be

23

carried as baggage.

9.3. In accordance with international regulations, Transport Ministry Instruction no. 40/0151 of 18 March 1996, integrated by ENAC Instruction no. 99-2632/DG of 22 July 1999, prohibits the use on board the aircraft of all portable electronic devices, with the exception of:

- hearing-aids systems;

- pace-makers;

- electric shavers;

- portable sound systems (i) not laser reading or (ii) digital;

- personal portable computers that are not connected to printers or to CD players, to a limited extent of the cruise time and only if specifically approved by the Captain.

9.4. If the objects not acceptable as baggage referred to above are nevertheless placed in baggage and are lost or damaged, the passenger will not have any right to compensation, subject to the provisions of these G.C.C. with regard to damage caused by the contents of baggage.

9.5. The passenger will have the right to carriage of:

– firearms and munitions for hunting and sport as checked baggage, provided they are unloaded, with safety catch on, and appropriately packed in conformity to applicable ICAO and IATA procedures;

– objects and products needed in relation to the passenger's state of health;

– medicines and cosmetics in quantities strictly limited to personal needs.

Objects such as antique firearms, swords, knives and the like may be accepted only as checked baggage at the Carrier's discretion, and under no circumstances will they be permitted in the passenger cabin.

The above conditions must conform to security provisions and regulations in the countries of departure and destination and of the countries flown over, and to the modalities established by such provisions and regulations, as compatible with the company's ordinary means.

9.6. Subject to provisions regarding objects acceptable under certain conditions, the Carrier has the right to refuse to check in objects that are unacceptable as baggage or to refuse further carriage if and when it becomes aware of their presence on board the aircraft.

The Carrier has the right to refuse to carry as baggage any object that is unsuitable for carriage on the aircraft due to its dimensions, shape, weight, content, peculiar characteristics, fragility, perishability, for security or operative reasons, or because it may inconvenience or disturb other passengers.

The Carrier has the right to refuse to check in baggage for carriage if, in its reasonable opinion, it is not adequately contained in luggage or in other containers appropriate to guarantee safe carriage.

9.7. For reasons linked to the security of the aircraft and the passengers, the Carrier may request the passenger to undergo physical checks and inspections by means of specific devices, and checks and inspections of his/her baggage by means of electronic or radiogenic devices. If the passenger is not present, his/her property may be inspected to determine if the passenger is in possession of (or if his/her baggage contains) any objects for which carriage is prohibited pursuant to these G.C.C., firearms, munitions or other weapons, that have not been duly declared to the Carrier pursuant to these G.C.C..

If the passenger does not agree to the above-mentioned requests, the Carrier reserves the right to refuse to carry the passenger and his/her baggage.

24

If an inspection or search conducted with electronic or radiogenic devices harms the passenger or damages his/her baggage, the Carrier will not be liable to pay any compensation unless such harm or damage is attributable to its negligence.

9.8. Passenger's exercise of his/her rights under the Contract pertaining to the carriage and return of checked baggage is subject to his/her possession and presentation of the baggage check, given him/her at the time of check-in and bearing the name of the passenger to whom the Carrier undertakes the obligation of carriage, as well as the passenger's ticket number and the number of checked baggages carried.

If the person seeking to claim checked baggage is unable to produce the baggage check or to identify the baggage, the Carrier will return such baggage only if such person is able to give evidence and adequate proof of his/her right to claim such baggage. The Carrier reserves the right to subject such return to the issuance of a specific written release that will indemnify the Carrier against any and all further claims.

Receipt by the ticket holder of his/her checked baggage without any written complaint at the time of receipt indicates that the checked baggage has been delivered in good condition and in accordance with the contract of carriage.

9.9. The passenger has the right to travel with animals only if they are appropriately housed in containers designed for air carriage, specified by the Carrier, and have the required health and vaccination certificates, entry permits and other documents required by the countries of departure, destination, or transit.

If accepted as checked baggage, animals, with their container and food, will not be included in the free baggage allowance but will be considered excess baggage for which the passenger may be required to pay the applicable charge.

Guide dogs will be carried free of charge in addition to free baggage allowance, according to procedures indicated by the Carrier.

If the Carrier accepts animals for carriage, the passenger will not be guaranteed any compensation or refund if such animals are denied entry and/or transit in a country of destination or transit.

In addition, the Carrier assumes no liability for the lack or invalidity of required health and administrative documents for animals, and the passenger will be required to refund the Carrier for any and all sums it may have to pay as penalty or expense or damages due to such lack or invalidity.

9.10. In all cases of non-transportable objects, and in cases where the Carrier may refuse carriage or subject carriage to certain conditions, the passenger may request additional information from the Carrier or from its authorised agents, or access it from Carrier's other product distribution channels or from its website.

## ARTICLE X
## SCHEDULES, DELAYS, CANCELLATIONS, DENIED BOARDING

10.1. The times indicated on Carrier's official timetables may be changed between the date of publication of the timetable itself and the date of beginning of travel. The Carrier does not guarantee the exactness of such times and, therefore, they do not form part of the Contract.

10.2. At the time of reservation, the Carrier will inform the passenger of the scheduled departure time of the flight in effect at the time of reservation, which will be stated on the ticket.

If the Carrier is forced to change the scheduled departure time of the flight, it or its authorised agents will take all steps to publicise such change and to give passengers holding tickets with confirmed reservation sufficient advance notice of the schedule change with regard to such reservation.

If Carrier's changes to the scheduled departure time are such that the passenger is no longer interested in the flight, and the Carrier is unable to book the passenger on an alternate flight acceptable to the passenger, the passenger may request the Carrier to refund the amount paid, in conformity to the terms and conditions of the G.C.C.

10.3. The Carrier adopts all possible and reasonably feasible means to avoid delays in carriage of the passenger and his/her baggage, as well as to avoid flight cancellations and denied boarding.

10.4. In this regard, in line with the provisions of EC Regulation no. 261/2004 with respect to passengers:

a) departing from an airport located in the territory of a Member State of the European Union subject to the provisions of the European Community Treaty;
b) departing from an airport located in a non-EU State with destination to an airport located in the territory of a Member State of the European Union to which said Treaty applies (except when the passengers receive benefits or compensations in goods and/or services or a financial indemnity and they have been provided service in such non-EU State);
c) who have confirmed reservation on the flight concerned;
d) and who, except in cases of cancellation, arrive for boarding in conformity to prescribed rules and at the time previously indicated in writing (including electronically) by the Carrier, tour operator or authorised travel agent or, if no time is indicated, at least forty-five minutes before the published departure time;
e) who may have been transferred by the Carrier or by a tour operator from the flight for which they hold a reservation to another flight, regardless of the reason;
f) who do not travel free of charge or at a reduced fare that is not available, directly or indirectly, to the public, except if they hold tickets issued under a frequent flyer programme or other commercial programme by the Carrier or tour operators;

The Carrier, whatever the operating carrier for the flight in question pursuant to EC Regulation 261/2004 of the European Parliament and of the Council of the European Union, and without prejudice to the passengers' rights under applicable law (including EC Directive 90/314 regarding package travels) as well as to their rights under the other clauses of these G.C.C. with regard to the Carrier's civil liability, will
        **A) In case of delay**:
- if the Carrier can reasonably foresee that a flight will be delayed

(a) for two or more hours for all flights covering distances less than or equal to 1,500 kilometres; or

(b) for three or more hours for all intra-community flights covering distances greater than 1,500 kilometres, and for all other fights covering distances from 1,500 to 3,500 kilometres; or

(c) for four or more hours for all flights not falling under letters (a) or (b) above

**offer at no cost**:

- food and drink in conformity to the length of the delay; and
- two telephone calls or messages via telex, fax or e-mail;

 - if the reasonably foreseeable departure time is delayed by at least one day compared to the previously foreseen departure time, in addition to the above-describe service,

**offer at no cost**:

i) hotel accommodation in the following cases:
- if one or more overnight stays are necessary, or
- if an additional stay is necessary, beyond that planned by the passenger; and
ii) transport between the airport and the place of accommodation (hotel or other);

 - when the delay is at least five hours and the passenger decides not to travel on the delayed flight, in addition to the above-describe meal and message services,

**offer** refund of the entire cost of the ticket within seven days (in cash, by means of wire transfer, with bank deposits or cheques or, subject to written agreement, with travel vouchers and/or other services) at the purchase price, for the part or parts not taken, and for the part or parts already taken if the flight in question has become pointless with regard to the initial travel programme, as well as, if appropriate, a return flight to the initial point of departure as soon as possible.

The service described at letters (a)-(c) above will be provided by defined deadlines based on each range of distance indicated therein;

**B) In case of cancellation**,

in addition to **informing** passengers of available alternative means of transport, **offer** the following service:

**(I) a choice of:**

(a) refund of the entire cost of the ticket within seven days (in cash, by means of wire transfer, with bank deposits or cheques or, subject to written agreement, with travel vouchers and/or other services) at the purchase price, for the part or parts not taken, and for the part or parts already taken if the flight in question has become pointless with regard to the initial travel programme, as well as, if appropriate, a return flight to the initial point of departure as soon as possible; or

(b) re-routing to the final destination on an alternative flight under comparable conditions of carriage as soon as possible; or

(c) re-routing to the final destination on an alternative flight under comparable conditions of carriage on a subsequent date chosen by the passenger, subject to availability of seating;

**(II) in addition, at no cost:**

(a) food and drink in conformity to the length of the delay; and
(b) two telephone calls or messages via telex, fax or e-mail; as well as

27

(c) in case of re-routing on a flight alternative to the cancelled flight, when the reasonably foreseeable departure time for the new flight is delayed by at least one day compared to the scheduled departure time of the cancelled flight:
   (i) hotel accommodation in the following cases:
      (c) if one or more overnight stays are necessary, or
      (d) if an additional stay is necessary, beyond that planned by the passenger; and
   (ii) transport between the airport and the place of accommodation (hotel or other);

**(III) in addition, unless:**

(e) the passenger had been informed of the cancellation at least two weeks before the scheduled departure time; or

(f) the passenger had been informed of the cancellation between two weeks and seven days before the scheduled departure time and was offered re-routing on an alternate flight not more than two hours before the scheduled departure time, with arrival at the final destination less than four hours after the scheduled arrival time; or

(g) the passenger had been informed of the cancellation less than seven days before the scheduled departure time and was offered re-routing , departing on an alternate flight not more than one hour before the scheduled departure time, with arrival at the final destination less than two hours after the scheduled arrival time; or

(h) the Carrier can prove that cancellation was due to extraordinary circumstances that could not have been avoided even if all reasonable measures had been taken;

**pay the following compensation:**
   (a) EUR 250 for all flights covering distances less than or equal to 1,500 kilometres;
   (b) EUR 400 for all intra-community flights covering distances greater than 1,500 kilometres, and for all other fights covering distances from 1,500 to 3,500 kilometres;
   (c) EUR 600 for all flights not falling under letters (a) or (b) above.

If departure for the final destination on an alternate flight is offered as described at point I. (b) or (c), and the arrival time of such alternate flight does not exceed the scheduled arrival time of the originally booked flight:

(1) by two hours, for all flights covering distances less than or equal to 1,500 kilometres; or

(2) by three hours, for all intra-community flights covering distances greater than 1,500 kilometres, and for all other fights covering distances from 1,500 to 3,500 kilometres; or

(3) by four hours, for all flights not falling under cases (1) or (2),
the Carrier may reduce such above-described compensation by 50%.

**C) In case of denied boarding:**
- before denying boarding for a flight, **call** passengers willing to voluntarily surrender their reservations in exchange for benefits under conditions to be agreed and for appropriate service as described at point I below;

- if there is an insufficient number of volunteers, and the Carrier refuses to board a passenger against his will, **pay the following compensation:**

   (a) EUR 250 for all flights covering distances less than or equal to 1,500 kilometres;
   (b) EUR 400 for all intra-community flights covering distances greater than 1,500 kilometres, and for all other fights covering distances from 1,500 to 3,500 kilometres;
   (c) EUR 600 for all flights not falling under letters (a) or (b) above.

If departure for the final destination on an alternate flight is offered as described at point I. (b) or (c) below, and the arrival time of such alternate flight does not exceed the scheduled arrival time of the originally booked flight:

(1) by two hours, for all flights covering distances less than or equal to 1,500 kilometres; or

(2) by three hours, for all intra-community flights covering distances greater than 1,500 kilometres, and for all other fights covering distances from 1,500 to 3,500 kilometres; or

(3) by four hours, for all flights not falling under cases (1) or (2) of this paragraph,

the Carrier may reduce such above-described compensation by 50%.

To determine distances, the basis of calculation will be the last destination at which the denial of boarding delays the passenger's arrival after the scheduled time.

The compensation referred to above will be paid in cash, by means of wire transfer, with bank deposits or cheques or, subject to written agreement, with travel vouchers and/or other services.

Distances will be measured by the great circle route method.

**In addition to the above, offer:**

**I. A choice of:**

(i) refund of the entire cost of the ticket within seven days (in cash, by means of wire transfer, with bank deposits or cheques or, subject to written agreement, with travel vouchers and/or other services) at the purchase price, for the part or parts not taken, and for the part or parts already taken if the flight in question has become pointless with regard to the initial travel programme, as well as, if appropriate, a return flight to the initial point of departure as soon as possible; or

(j) re-routing to the final destination on an alternative flight under comparable conditions of carriage as soon as possible; or

(k) re-routing to the final destination on an alternative flight under comparable conditions of carriage on a subsequent date chosen by the passenger, subject to availability of space;

**II. in addition, at no cost:**

food and drink in conformity to the length of the delay;

(a) hotel accommodation:
- if one or more overnight stays are necessary, or
- if an additional stay is necessary, beyond that planned; and

(b) transport between the airport and the place of accommodation (hotel or other);

(c) two telephone calls or messages via telex, fax or e-mail.

For purposes of the above, "final destination" is defined as the final destination specified on the ticket presented at the check-in counter or, in case of connecting flight, the destination of the final flight; available alternate connecting flights are not considered if the original arrival time is respected.

The passenger can find all necessary and useful information at Carrier's airport check-in points, at its authorised agents, through its other product distribution channels, and on its website.

# ARTICLE XI
## REFUNDS

11.1. Subject to the terms and conditions of Article X above, the Carrier will refund the ticket or any unused portion thereof, in conformity to applicable fare rules, as described below.

The passenger has the right to refund of the amount paid for carriage, if the services to be provided by the Carrier pursuant to the contract are not provided or are not requested in whole or in part, with the exception of any more restrictive conditions provided by the fare(s) chosen by the passenger.

11.2. The ticket holder or the person who paid for the ticket will have a right to refund.

If the ticket was paid by someone other than the holder, the Carrier will effect refund only to such person or subject to his/her instructions, upon presentation of appropriate proof, and provided the ticket contains corresponding instructions.

Refund effected by the Carrier in good faith and without negligence to a person who appears to be the holder and/or purchaser of the ticket, is deemed to be correctly effected with respect to the person entitled.

Except in case of a lost ticket, the ticket holder/purchaser will have a right to refund only when the ticket and all unused flight coupons are returned to the Carrier.

If the ticket is unused, any and all taxes collected by the Carrier together with the fare and indicated on the ticket will be reimbursed.

Refund of such taxes is also applicable to non-refundable tickets purchased pursuant to specific promotional offers. In case of partial use (one segment only), the amount reimbursed will be proportionate to the taxes on the segment not flown.

11.3. If the passenger loses interest in travelling or does not request its performance, the Carrier will make voluntary refund of the amount paid only if the ticket was issued by the Carrier itself or by one of its authorised agents.

In this case, the amount reimbursed, less any expenses reasonably incurred by the Carrier for such service, will be:

− the entire sum paid if no part of carriage has been performed;

or

− equal to the difference between the sum paid and the sum relating to carriage performed, if carriage has been performed only in part.

The above provisions apply subject to any more restrictive conditions provided by the chosen fares.

11.4. Subject to the terms and conditions in the preceding paragraphs, if a ticket is lost, stolen, or totally/partially destroyed, the Carrier will refund such ticket or replace it in whole or in part at the passenger's request, provided:

a) the ticket holder exhibits a Police Report attesting to such loss, theft, or destruction;

b) the ticket holder provides proof, readily verifiable at the time of request, that the ticket had been validly issued;

c) the passenger undertakes to return the refund or, in turn, to reimburse the Carrier for any cost or

expense – up to the total price of the lost, stolen, or destroyed ticket – reasonably and necessarily incurred by the Carrier or by another carrier for any fraudulent use of the ticket, or for its refund to persons other than the person entitled who obtain it fraudulently.

The Carrier will not require the passenger to pay costs that the Carrier incurs due to its own negligence. When re-issuing the ticket, the Carrier may require payment of a reasonable fee for such service, unless loss or destruction of the ticket is attributable to negligence of the Carrier or of its agents.

The Carrier is liable to the passenger if it is proved that loss or destruction of the ticket was caused exclusively by negligence of the Carrier or of its employees.

If the above-mentioned proof is not provided, or if the passenger refuses to undertake in writing to refund the Carrier as described above, the Carrier may require the passenger to pay an amount up to the full price of the replaced ticket when it issues the new ticket, such amount to be refunded when the Carrier verifies that the lost, stolen, or destroyed ticket has not been used prior to its expiration date. If the passenger regains possession of the ticket prior to its expiration date, such refund will be made when the ticket is returned to the Carrier.

In all cases, a lost, stolen, or destroyed ticket will be refunded or replaced only after it has been verified that the ticket or part of it has not already been refunded or replaced.

11.5. A ticket issued by the Carrier or by one of its authorised agents may be refunded up to 30 (thirty) days after its expiration date, subject to any more restrictive conditions provided by the agreed fare.

The Carrier reserves the right to refuse to refund a ticket if such refund may conflict with the immigration laws in force in the country in which the refund is requested.

The Carrier reserves the right to make the refund with the same methods and currency used to pay for the ticket.

Voluntary refunds will be made only by the carrier that originally issued the ticket or by one of its authorised agents.

# ARTICLE XII
## CONDUCT ABOARD

12.1. If a passenger aboard the aircraft:

−   conducts himself/herself so as to endanger the aircraft or any person or property;

−   disturbs the other passengers and the crew or acts in such a way as to cause a disturbance;

−   causes damage to the aircraft or baggage, or harms the other passengers or crew;

−   obstructs the crew in the performance of its duties;

−   disregards the crew's instructions about proper behaviour on board or respect of inflight procedures;

the Carrier may take appropriate measures to prevent or limit continuation of such conduct, including restraint within legal limits, and may disembark the passenger concerned or refuse to continue the carriage.

In addition to the above, the Carrier reserves the right to report a passenger who acts in the above-described manner if such action is considered a criminal or disciplinary offence under applicable law.

12.2. The passenger undertakes to follow Carrier's instructions that, for reasons of flight safety, prohibit or limit the on-board use of electronic devices such as, for purposes of example only:

−   cell phones, portable computers, portable recorders, portable radio devices, CD players;

−   electronic games;

−   receiver-transmitter devices, including remote-controlled or radio-controlled toys and walkie-talkies.

The above does not include medical devices such as hearing aids or pacemakers essential to the passenger's health, about which the Carrier must be informed in advance.

12.3. The passenger also undertakes to follow Carrier's rules that prohibit smoking on its aircraft.

## ARTICLE XIII
## ADDITIONAL SERVICES

When the Contract is stipulated, if the Carrier agrees to arrange the supply of additional services by third parties, or if the Carrier issues coupons for carriage other than air carriage, or other services such as hotel bookings, car leasing, etc., the Carrier will be considered only an intermediary and, therefore, will have no liability to the passenger except as may relate to such intermediary role and pursuant to applicable law.

If the Carrier provides the passenger with ground transportation service outside an airport, these G.C.C. will not apply to such transportation.

33

# ARTICLE XIV
## ADMINISTRATIVE FORMALITIES

The passenger must hold the necessary travel documents and must comply with laws, regulations, orders, rules, and conditions emanated by the country of departure, destination, or transit. Therefore, he/she will have no right to any damages or refund from the Carrier due to consequences deriving from the lack or falsity of such documents or visas or from the infringement of such laws, regulations, orders, rules, and conditions.

Subject to the terms of Art. IX point 9 above, the passenger undertakes to reimburse the Carrier for all sums paid or deposited and for all expenses incurred due to the lack or falsity of required documents or due to the failure to comply with laws, regulations, orders, rules and conditions emanated by the country of departure, destination, or transit. For such payments, the Carrier may use any other sum that the passenger has paid for carriages not yet performed or for any other reason.

The passenger undertakes to show the Carrier all documents required by the laws, regulations, orders and rules of the country of departure, transit, and destination, and must make certain that they are in order.

The passenger also undertakes to allow the Carrier to make a copy of such documents for purposes of complying with national, international, and foreign immigration laws. The Carrier guarantees that the data contained therein will be processed in conformity to regulations for the protection of privacy.

The passenger who lacks the above-mentioned documents or who presents documents that are not in order will lose his/her right to carriage.

Whenever a passenger is denied entry in a country, such passenger must reimburse the Carrier for any and all fines or other money-penalties issued, as well as all costs and expenses incurred as a result of such denied entry.

Moreover, the passenger will not have any right to a refund of amounts paid for carriage to the place of denied entry or expulsion.

The passenger is obliged to submit himself or herself to all ordinary security checks legitimately conducted by competent authorities, by other authorised parties, or by the Carrier.

In case of physical harm to the passenger or damage to his/her baggage caused by equipment used for security checks not conducted directly by the Carrier or not managed by it, the passenger will not have any right to damages from the Carrier unless its fault is duly proved.

The passenger also undertakes to permit inspections of his/her person and baggage by Customs Officers, as well as by other governmental authorities or competent parties, including on request of the Carrier, if based on objective reasons of security.

The passenger will not have any right to damages from the Carrier for any harm to his/her person or damage to his/her baggage during the inspections referred to above, unless Carrier's fault is duly proved.

The passenger will not have any right to carriage if he/she opposes such inspections.

## ARTICLE XV
## SUCCESSIVE CARRIERS

Subject to the terms and conditions in the part of the general provisions referring to cumulative carriage, carriage to be performed by successive carriers based either on a single ticket or on tickets issued in conjunction is considered a single operation.

# ARTICLE XVI

## CARRIER'S LIABILITY IN CASE OF DEATH OR INJURIES OF PASSENGERS

16.1. According to applicable regulations, the Carrier is liable for damage sustained in case of death, wounding or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

Carrier's liability for damage sustained in case of death or bodily injury of a passenger due to an accident taking place on board the aircraft or in the course of any of the operations of embarking or disembarking is not subject to any financial limit.

16.2 For damages not exceeding 100,000 SDR (approx. € 115,000) sustained in case of death or bodily injury of a passenger, the carrier shall not be able to exclude or limit its liability.

16.3. The Carrier will not be liable for damage sustained in case of death or bodily injury of a passenger to the extent that they exceed 100,000 SDR (approx. € 115,000) if it proves that:

a) such damage was not caused by the negligence, wrongful act, or omission of the Carrier or of its employees or agents;

or that

b) such damage was caused exclusively by the negligence, wrongful act, or omission of a third party.

16.4. If the passenger's age or physical and/or mental state are such that air carriage implies any risk or danger for such passenger, the Carrier will not be liable for the worsening of such state, or for the arising of any illness, injury, disability, or death, that can be attributable to such state.

16.5. Carrier's insurance coverage for liability to passengers is adequate and conforms to applicable laws.

16.6. The Carrier must, without delay, and in all cases within 15 (fifteen) days after identification of the individual entitled to damages, make advance payments required to satisfy immediate economic needs in proportion to the damage suffered.

In case of death, advance payments will not be less than 16,000 SDR (approx. € 18,400) per passenger.

An advance payment does not constitute acknowledgement of liability, and may be offset against any additional amount due based on Carrier's liability.

The Carrier has the right to demand total or partial restitution of such advance payment if such payment is deemed to have been unwarranted because it is subsequently proved that the damage was caused in whole or in part by the negligence of the injured or deceased passenger, as well as if it is subsequently demonstrated that the beneficiary of the advance payment had provoked or contributed to the damage with his/her negligence or if he/she is not the person entitled to compensation.

36

## ARTICLE XVII

## CARRIER'S LIABILITY FOR DAMAGE TO BAGGAGE

17.1. According to applicable regulations, the Carrier is liable for damage sustained in case of destruction or loss of, or damage to, checked baggage upon condition only that the event which caused the destruction, loss or damage took place on board the aircraft or during any period within which the checked baggage was in the charge of the Carrier.

However, the Carrier is not liable if and to the extent that the damage resulted from the inherent defect, quality or vice of the baggage.

17.2. If the Carrier admits the loss of the checked baggage, or if the checked baggage has not arrived at the expiration of 21 (twenty-one) days after the date on which it should have arrived, the passenger is entitled to enforce against the Carrier the rights deriving from the contract of carriage.

17.3. In case of unchecked baggage, the Carrier is liable if the damage derives from its fault or that of its employees or agents.

17.4. In the carriage of both checked and unchecked baggage, the liability of the Carrier in case of destruction, loss, or damage is limited to 1,000 SDR (approx. € 1,500) per passenger.
Notwithstanding the above, the passenger has the right, when the checked baggage is handed over to the Carrier, to make a special declaration of interest in delivery at destination, paying a supplementary sum if so required. In that case the Carrier will be liable to pay a sum not exceeding the declared sum, unless it proves that the sum is greater than the passenger's actual interest in delivery at destination.

17.5. Provisions regarding the limits of Carrier's liability in case of destruction, loss or damage of both checked and hand baggage will not apply if it is proved that the damage resulted from an act or omission of the Carrier, its employees or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result; provided that, in the case of such act or omission of an employee or agent, it is also proved that such employee or agent was acting within the scope of his/her employment.

17.6. The Carrier is not liable for personal injury and damage to the passenger's baggage caused by the contents of such baggage. The passenger whose baggage has caused injury to another passenger or damage to another passenger's baggage or to Carrier's property will have to compensate the Carrier for all such damage and the expenses deriving therefrom.

17.7. The Carrier is not liable for damage to checked baggage if such baggage consists of goods or objects that do not come under the definition of checked baggage contained in these G.C.C.

In particular, the Carrier will not be liable for damage to or the loss of valuable, fragile, or perishable objects, cash, jewels, silverware and precious metals in general, negotiable securities, credit instruments, stock and bond certificates or other securities, business, or commercial documents, sample collections, passports and other personal identification documents, that have been placed in the passenger's checked baggage contrary to the provisions of Art. IX of these G.C.C.

17.8. If the weight of checked baggage is not recorded on the baggage check, it is assumed that the total weight of checked baggage does not exceed the weight allowance for the service class in question.

## ARTICLE XVIII

## CARRIER'S LIABILITY FOR DAMAGE DUE TO
## DELAY IN CARRIAGE OF PASSENGERS AND BAGGAGE

18.1. According to applicable regulations, the Carrier is liable for damage caused by delayed carriage of passengers. Nevertheless, the Carrier is not liable for damage caused by delay if it proves that it and its employees and agents took all measures that could reasonably be required to avoid such damage, or that it was impossible for them to take such measures.

18.2. In case of damage caused by delay in the carriage of passengers, Carrier's liability is limited to 4,150 SDR (about € 4,773) per passenger.

Such limit will not apply if it is proved that the damage resulted from an act or omission of the Carrier, its employees or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result; provided that, in the case of such act or omission of an employee or agent, it is also proved that such employee or agent was acting within the scope of his/her employment.

18.3. The Carrier is liable for damage caused by delayed carriage of passenger's baggage. Nevertheless, the Carrier is not liable for damage caused by delay if it proves that it and its employees and agents took all measures that could reasonably be required to avoid such damage, or that it was impossible for them to take such measures.

18.4. In case of damage caused by delay in the carriage of baggage, Carrier's liability is limited to 1,000 SDR (about € 1,500) per passenger.

Such limit will not apply if it is proved that the damage resulted from an act or omission of the Carrier, its employees or agents, done with intent to cause damage or recklessly and with knowledge that damage would probably result; provided that, in the case of such act or omission of an employee or agent, it is also proved that such employee or agent was acting within the scope of his/her employment.

## ARTICLE XIX

## UNIFORM RULES REGARDING CARRIER'S LIABILITY

19.1. If the Carrier proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of the person claiming compensation, the Carrier will be wholly or partly exonerated from its liability to the claimant to the extent that such negligence or wrongful act or omission caused or contributed to the damage.

When by reason of death or injury of a passenger compensation is claimed by a person other than the passenger, the Carrier will likewise be wholly or partly exonerated from its liability to the extent that it proves that the damage was caused or contributed to by the negligence or other wrongful act or omission of that passenger.

19.2. The Carrier is not liable for damage that may result from its or the passenger's compliance with laws, regulations, orders and instructions from authorities.

19.3. In no case can Carrier's liability exceed the amount of damage proved. Moreover, the Carrier is not liable for indirect or consequential damages, understood as damages that are not foreseeable as normal effects of Carrier's default or wrongful act. Nor will the Carrier be liable for damage that the passenger could have prevented by using ordinary diligence.

19.4. Any exclusion or limitation of Carrier's liability will also apply to its agents, employees, assistants and servants, provided it is proved that they acted within the scope of their employment, as well as any company – and its agents, employees or representatives – whose aircraft is used by the Carrier.

19.5. Unless otherwise established to the contrary, no rule contained herein causes or implies Carrier's waiver of any exclusion or limitation of liability provided the Carrier under the Montreal Convention or under other applicable laws.

## ARTICLE XX

## TIME LIMITATION ON CLAIMS AND ACTIONS

20.1. Receipt by the person entitled to delivery of checked baggage without complaint is prima facie evidence that same has been delivered in good condition and in accordance with the document of carriage.

20.2. In case of damage to checked baggage (destruction, deterioration, tampering, total or partial loss, delay), the person entitled to delivery must:

- as soon as the damage is discovered, immediately file a report with the Carrier at the airport of destination, using the appropriate form that includes a detailed list of the contents of the baggage, and
- complain within 7 (seven) days from the date of receipt of checked baggage in the manner specified by the Carrier or by its authorised agents when the damage report is filed. In case of delay, the complaint must be made at the latest within 21 (twenty-one) days from the date on which the baggage has been placed at his/her disposal.

If the damage can be noted when checked baggage is received, the person entitled to delivery must make an immediate complaint. Otherwise, when the complaint is presented the passenger will have to prove that the damage occurred during the period in which the Carrier had charge of the checked baggage, and not before or after such period.

20.3. The complaint must be made in writing and presented or transmitted by the above-mentioned deadlines.

In the absence of an immediate report, where possible, and of a complaint by such deadlines, no action may be brought against the Carrier, unless the Carrier has committed fraud.

20.4. With regard to the carriage of passengers and unchecked baggage, the right to damages shall be extinguished if an action is not brought within two years from the date of arrival at the destination or from the date on which the aircraft ought to have arrived, or from the date the carriage was interrupted. The method of calculating that period shall be determined by the law of the court seized of the case.

In case of checked baggage, the right to damages shall be extinguished if an action is not brought within two years from the date of delivery or from the date that delivery should have been made. The method of calculating that period shall be determined by the law of the court seized of the case.

20.5. In the carriage of passengers and baggage, any action for damages, however founded, under the contract of carriage, can only be brought subject to the conditions and such limits of liability as are set out in the Montreal Convention and implemented by these G.C.C., without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights.

In any such action, punitive, exemplary or any other non-compensatory damages shall not be recoverable.

20.6. An action for damages must be brought, at the option of the plaintiff, before:

1) the court of the domicile of the Carrier, or

2) the court of Carrier's principal place of business, or

3) the court where the Carrier has a place of business through which the contract was stipulated, or

40

4)  the court of the place of destination.

In respect of damage resulting from the death or injury of a passenger, an action may be brought before one of the courts mentioned in the previous paragraph, or

5) in the territory of a Member State of the European Union or party to the Montreal Convention in which at the time of the accident the passenger has his or her principal and permanent residence and to or from which the Carrier operates services for the carriage of passengers by air, either on its own aircraft, or on another carrier's aircraft pursuant to a commercial agreement, and in which the Carrier conducts its business of carriage of passengers by air from premises leased or owned by the Carrier itself or by another carrier with which it has a commercial agreement.

For purposes of the above:

a) 'commercial agreement' means an agreement, other than an agency agreement, made between carriers and relating to the provision of their joint services for carriage of passengers by air;

(b) 'principal and permanent residence' means the one fixed and permanent abode of the passenger at the time of the accident. The nationality of the passenger shall not be the determining factor in this regard.

Questions of procedure shall be governed by the law of the court seized of the case.

41

## ARTICLE XXI

## CHANGES AND WAIVERS

When the ticket is reserved, the passenger is informed that no agent, employee, or servant of the Carrier has the power to substitute, change, or cancel the rules in these G.C.C.

No clause in these G.C.C. may be interpreted as a waiver of Carrier's legal obligations.